181 So.2d 722 (1966)
Charles AMARA and Elizabeth G. Amara, his wife, Appellants,
v.
The TOWN OF DAYTONA BEACH SHORES, a Municipal corporation, Appellee.
No. F-513.
District Court of Appeal of Florida. First District.
January 18, 1966.
Rehearing Denied February 4, 1966.
*723 Robert L. Wilson, St. Petersburg, for appellants.
Norton Josephson, Daytona Beach, for appellee.
RAWLS, Chief Judge.
The plaintiffs, beach concessionaires, have appealed a final decree which found that the major portion of Ordinance 62-10 of the Town of Daytona Beach Shores was valid and enforceable against the plaintiffs.
The Town of Daytona Beach Shores borders on the Atlantic Ocean and extends four miles in length from north to south along the water. This four miles of beach is part of an 18 mile stretch advertised as the World's Most Famous Beach and characterized by a beach so wide that automobiles are allowed to drive upon and park on it. Daily in the summer season mobile beach concessionaires pull their wagons there to sell hot dogs, cokes, ice cream, and suntan oil; to rent bicycles, motor scooters, midget cars, floats, etc.; and to sell rides on miniature trains and fire trucks. Post cards advertising this beach show lines of parked automobiles interspersed with the colorful wagons of the concessionaires, who from custom usually park in the same spot daily to dispense their wares. Their parking places are sometimes above and sometimes below the high water mark.
The improved property adjoining the beach area is utilized mostly by motels whose seawall or bulkhead lines are westerly of the high water mark. Just who owns the land between the high water mark and these easternmost lots was the subject of much of the parties' arguments. This property was platted into a number of large subdivisions from 1887 until about 1924. One plat clearly shows that the eastern-most lots go to the high water mark; another clearly shows that the eastern-most lots are bounded on the east by a street which never was developed and so the lots do not extend to the high water mark. Although most of the other plats are vague and susceptible of different interpretations, even by experts, they do designate existing streets and describe the lot measurements in metes and bounds. A recent survey made by civil engineer Vernon C. Stepp revealed that at that time the eastern boundary of only 25% of the beach side lots described in the plats extend to the high water mark while the eastern lot lines of the other 75% are located westerly of the known high water mark. There was no evidence that erosion or accretion had increased or decreased the beach area between the east boundary of the lots and the high water mark since the time of platting the area.
On October 26, 1962, the Town of Daytona Beach Shores adopted ordinance 62-10 which increased the occupational license fee for beach concessions from $75 to $225 annually, limited the total number of concessions allowed on the beach, divided the beach into four zones and limited the type and number of concessions for each zone. The ordinance further provided:
"Before any license or permit or any renewal thereof shall be issued to a licensee or concessionaire, the written consent of the ocean front property owner possession property rights, including but not limited, to riparian or *724 littoral rights to the Atlantic Ocean Beach, and in front of whose property said concession is to be located shall be first obtained * * *"
The concessionaires sought to restrain the city from enforcing the ordinance on the ground that it is void and unconstitutional because 1. The City cannot make its authority to license a legitimate business dependent upon the unbridled discretion of a single individual, and 2. The ordinance upon its face is so vague, ambiguous, arbitrary, oppressive and impossible of compliance as to be an unreasonable exercise of police power.
Although the entire ordinance was attacked by this action, the section quoted above received the most attention from the parties and we find that review of it alone is sufficient to dispose of this appeal. Since the chancellor ruled in favor of the City, the final decree lends a presumption of validity to the ordinance.
Both parties agree that the ordinance requires, as a prerequisite to obtaining a license, a concessionaire to secure the written consent of the "oceanfront property owner possession * * * riparian or littoral rights" to the beach upon which he desires to locate his concession. There is no provision for securing a license or renewal thereof without such written consent. Both parties further agree that only those property owners whose property extends to the ordinary high water mark[1] have riparian rights and only these may give consent under the ordinance. However, both parties by the testimony of their respective experts (land surveyors) have elicited conflicting views as to whether the plats show that the eastern boundary of the eastern-most lots of the vast majority of the subdivisions extend to the high water mark. Thus, experienced land surveyors disagree as to who is the "oceanfront property owner" whose permission is required by the ordinance. If this situation would seem to complicate the administration of the ordinance, how much more complicated is its administration as to that oceanfront property where both parties are in agreement that the plats clearly show that the easternmost lots do not extend to the ordinary high water mark? There mixed questions of law and fact  such as, ownership by original subdivider, reservation by original grantor, acceptance or abandonment of public easements, the effect of erosion or accretion, etc.  would affect the determination of who was the "oceanfront property owner" referred to in the ordinance.
The general rule is to the effect that an ordinance which vests in municipal authorities arbitrary discretion to grant or revoke a license to carry on an ordinary lawful business, without prescribing definite rules and conditions for the guidance of the authorities in the execution of their discretionary power, is invalid.[2] Licensing ordinances must prescribe definite rules and conditions which the applicant shall meet and may not leave the determination of the applicant's fitness or suitability to the undirected and uncontrolled discretion of even the licensing authority.[3]
The ordinance in question sets forth no criteria for determining the fitness and qualifications of concessionaires other than the prerequisite of securing the oceanfront property owner's consent. The burden of determining who is an oceanfront property owner having riparian rights involve legal questions too intricate to impose as a condition precedent to the issuance of a license to conduct a legitimate business. The question here is not the awarding of the privilege to operate a concession *725 on city property, but the right here involved is the right to be licensed to conduct a business either on private property or upon property held by the state in trust for the public.
Although the ordinance upon its face purports to be enacted for the purpose of "keeping order, suppressing crime, to foster a better moral condition, enforce sanitary regulations and assist in more thorough police control", the ordinance as approved by the chancellor does not affect sanitary regulations, does not regulate any businesses known to foster immoral conditions or crime and does not involve businesses requiring constant police control. Even if the licensing of businesses selling hot dogs or rides on miniature trains could be classified as regulations imposed to promote health, welfare, safety and morals, it is still necessary that the exactions be fixed in the ordinance with such certainty that the granting and denial of a license could not be left to the whim of a private property owner or the administrative agency.
In State ex rel. Taylor v. City of Tallahassee,[4] our Supreme Court held a similar statute "bad for indefiniteness", "arbitrary and oppressive." There the ordinance required that applications for a license to operate a pool or billiard room be approved by the "owners of 60 per cent. of the property according to front feet fronting on the street, avenue, or thoroughfare in the block where such pool and billiard room is to be located and also on the blocks adjoining thereto on the North and South and/or on the East and West of said block." The rule controlling the decision was that a legislative body of a city cannot delegate its function to legislate  that is, to exercise discretion as to the content of the law. It may make a law and incorporate therein a condition precedent upon which execution may depend, but it cannot be made to depend on the unbridled discretion of a single individual.[5]
We conclude that the ordinance is void for indefiniteness and because it constitutes an unauthorized delegation of legislative power by the city. Having reached this conclusion, we find it unnecessary to consider the other points involved.
Reversed.
CARROLL, DONALD K., and JOHNSON, JJ., concur.
NOTES
[1] Section 271.09(1), Florida Statutes, F.S.A.
[2] Permenter v. Younan, 159 Fla. 226, 31 So.2d 387 (Fla. 1947).
[3] State ex rel. Ware v. City of Miami, 107 So.2d 387 (Fla.App.3d, 1958).
[4] State ex rel. Taylor v. City of Tallahassee, 130 Fla. 418, 177 So. 719 (1937).
[5] Id. at 177 So. page 721.