# Third District Court of Appeal

## State of Florida

Opinion filed July 27, 2016.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D15-2303 & 3D15-2271
Lower Tribunal No. 14-A369OZE

_____

**State of Florida, by and through the City of Aventura, et al.,**
Appellants,

vs.

**Luis Torres Jimenez,**
Appellee.

Appeals pursuant to Florida Rule of Appellate Procedure 9.160 from the County Court for Miami-Dade County, Steven Leifman, Judge.

Pamela Jo Bondi, Attorney General, and Robert Dietz (Tampa), Assistant Attorney General, as Intervener for appellant; Weiss Serota Helfman Cole & Bierman, and Edward G. Guedes and Samuel I. Zeskind, for appellant City of Aventura.

Louis C. Arslanian (Hollywood); Wites & Kapetan, P.A., and Marc A. Wites (Lighthouse Point), for appellee.

Carlton Fields Jorden Burt, and Joseph H. Lang, Jr. and Kevin P. McCoy; Hamilton, Miller & Birthisel, and Jerry D. Hamilton and Ashlee A. Pouncy; Baker & Hostetler and Krista A. Sivick, for American Traffic Solutions, Inc., and Xerox State and Local Solutions, Inc., as amici curiae.

1

Johnson, Anselmo, Murdoch, Burke, Piper & Hochman and Christopher J. Stearns, for Bal Harbour Village, Town of Campbellton, City of Clermont, City of Cocoa Beach, City of Coral Springs, Town of Cutler Bay, City of Doral, Village of El Portal, City of Green Cove Springs, City of Hialeah Gardens, City of Holly Hills, Town of Juno Beach, Village of Key Biscayne, City of Lauderdale Lakes, Manatee County, City of Miami Gardens, City of Miami Springs, City of Milton, City of North Bay Village, City of Oldsmar, City of Opa Locka, City of Orange Park, City of Palatka, City of Palm Coast, Village of Palm Springs, City of Pembroke Pines, City of Sunrise, City of Surfside, City of Sweetwater, City of Tamarac, City of West Miami, City of West Park, City of Fort Lauderdale, New Port Richey, Port Richey, City of Cocoa Beach, Town of Davie, City of Coral Gables, North Miami Beach, Hillsborough County, City of Groveland, City of Hallandale Beach, City of Apopka, and Orange County ("Local Governments"), as amici curiae.

Before WELLS, EMAS, and LOGUE, JJ.

LOGUE, J.

The City of Aventura and the Attorney General of Florida appeal a decision of the county court dismissing a traffic citation that charged Luis Torres Jimenez with running a red light by turning right at an intersection marked no-turn-on-red. Probable cause for the citation was based on photographs and a video from the City's red light camera program which is serviced by American Traffic Solutions, Inc., a City vendor.

Jimenez challenged his ticket based on a claim that the City's red light camera program was illegal because (1) the Vendor was given unfettered discretion that exceeded the City's statutory authority to use an agent to "review" images, section 316.0083(1)(a), Fla. Stat. (2014); (2) the Vendor had unfettered discretion

2

in printing and mailing notices and citations in violation of a statutory requirement that only an officer can "issue" citations, id.; and (3) the Vendor had unfettered discretion to send an electronic copy of the citation to the Clerk of Courts in violation of the statutory requirement that only an officer "shall provide" an electronic copy to the Clerk, section 316.650(3)(c), Fla. Stat. (2014).

For the reasons explained below, we reject Jimenez's arguments. In particular, we hold that the review of red light camera images authorized by section 316.0083(1)(a) allows a municipality's vendor, as its agent, to review and sort images to forward to a police officer where, as here, (1) the vendor's decisions in this regard are strictly circumscribed by contract language, guidelines promulgated by the municipality, and actual practices, such that the vendor's decisions are essentially ministerial and non-discretionary; (2) these ministerial decisions are further limited by an overarching policy of automatically passing all close calls to the police for their review; (3) it is the police officer that makes the actual decision whether probable cause exists and whether a notice and citation should issue; and (4) the officer's decision that probable cause exists and a citation issues consists of a full, professional review by an identified officer who is responsible for that decision and does not merely acquiesce in any determination made by the vendor.

Due to these circumstances, we distinguish City of Hollywood v. Arem, 154 So. 3d 359 (Fla. 4th DCA 2014), in which the Fourth District dismissed a traffic citation on the grounds that a city's process of using red light cameras gave unfettered discretion to a vendor. Because of the broad public and institutional interest in red light cameras, we certify three issues to the Florida Supreme Court as having great public importance.

## BACKGROUND AND FACTS

**A. The Mark Wandall Traffic Safety Act.**

On July 1, 2010, the Legislature enacted the Mark Wandall Traffic Safety Act, which authorized local governments to use cameras to enforce traffic lights. Ch. 2010-80, Laws of Fla., partially codified at § 316.0083, Fla. Stat. (2010). The Wandall Act was named in honor of Mark Wandall, whose wife was nine months pregnant when he was killed by a driver who ran a red light. City of Orlando v. Udowychenko, 98 So. 3d 589, 596 n.10 (Fla. 5th DCA. 2012). According to the accompanying committee report, seventy-six people were killed in 2008 in Florida by drivers running red lights. See House of Representatives Staff Analysis, at p. 2, CS/CS/HB 325 (Mar. 9, 2010).

At the heart of the dispute in this case is the Wandall Act's express authorization for local governments to use "agents" to "review" images before the "officer" issues a citation. On this point, the Wandall Act reads, "[t]his paragraph

4

does not prohibit a review of information from a traffic infraction detector by an authorized employee or agent of the department, a county, or a municipality before issuance of the traffic citation by the traffic infraction enforcement officer." § 316.0083(1)(a), Fla. Stat.

**B. The Vendor's Sorting of Images.**

The City and the Vendor entered into a contract whereby the Vendor is responsible for installing, maintaining, monitoring, and assisting in administering a "digital photo red light enforcement system" which includes a network of computers, sensors, speed detectors, timers, cameras, printers, and mailing capabilities, all supported by software owned by or licensed to the Vendor.

Under the contract and its various amendments, the Vendor sorts the information and images generated by the system into two databases: a "working" database that the City police review to decide whether to issue a citation and a "non-working" database that the City police do not review for that purpose. Each image placed in the non-working database is reported, and the reason for placing the image in the non-working database is explained by the Vendor on a report screen. The report screen is periodically reviewed by the sergeant in charge of the City's review. The non-working database remains available and is occasionally accessed by the police for other investigations.

Each month, approximately 5,000 images are sorted into the working database and 3,000 are sorted into the non-working database. The police sergeant who oversees the City's review testified that the City would be overwhelmed if it was required to review all images generated by the system.

To sort images, the Vendor conducts a review that includes (1) confirming workable images exist (and the camera did not simply misfire); (2) examining the images to verify the license plate of the subject vehicle is legible; (3) using the license plate number in an automated process to obtain the identifying information of the registered owner from the Florida Department of Motor Vehicles; (4) confirming the capture of date, time-of-day, speed, and timing-of-light data; (5) checking the "A" shot, which is a still photograph showing the vehicle approaching the intersection; (6) checking the "B" shot, which shows the vehicle in the intersection; and (7) checking the twelve-second video clip that shows the vehicle approaching and traveling through the intersection. The Vendor can pause the video and view it frame by frame.

A representative of the Vendor testified that the Vendor's task when reviewing images was to filter out images that were "useless." A clear example, she explained, is where a camera simply misfired and failed to record an image. Other examples are where the light displays green or where images fail to capture a vehicle's license plate number. These images were useless, she testified, because

"the police cannot do anything with them." But other images are determined to be useless based on the specific and detailed contract language and City guidelines.

**C. Sorting Under the Prior 2008 Contract.**

The Vendor's responsibility and authority to sort images was first established in the 2008 Contract, where the Vendor's authority to review images was stated in a broad manner:

> The vendor shall make the initial determination that the image meets the requirements of the Ordinance and this Agreement, and is otherwise sufficient to enable the City [to] meet its burden of demonstrating a violation of the Ordinance. If the Vendor determines that the standards are not met, the image shall not be processed any further.

As discussed below, it is this 2008 Contract language that was quoted, analyzed, and relied upon by the Fourth District in the Arem decision cited by Jimenez. When this 2008 Contract was signed, no statute authorized local governments to enforce red lights with cameras.[1] On July 19, 2010, immediately after the effective date of the Wandall Act, the City and the Vendor amended the 2008 Contract and removed this language.

**D. Sorting Under the Current Amended Contract.**

---

[1] The Florida Supreme Court subsequently held that local governments required statutory authorization to use automatic cameras to enforce red light laws. Masone v. City of Aventura, 147 So. 3d 492 (Fla. 2014). While the Masone case was pending, the Legislature enacted the Wandall Act.

7

Among other things, the 2010 amendment expressly deleted the language from the 2008 Contract quoted above. Importantly, the deleted language was replaced with new language substantially narrowing the nature and scope of the Vendor's role in the process. The Amended Contract reads:

> Vendor shall act as City's agent for the limited purpose of making an initial determination of <u>whether the recorded images should be forwarded to an Authorized Employee to determine whether an infraction has occurred</u> and shall not forward for processing those recorded images that clearly fail to establish the occurrence of an infraction.

(emphasis added).

Significantly, the Amended Contract also expressly recognized that the Vendor had no authority to decide that a citation would issue. Instead, it provided that the decision to issue a citation can be made only by a police officer. The Amended Contract states:

> VENDOR HEREBY ACKNOWLEDGES AND AGREES THAT THE DECISION TO ISSUE A NOTICE OF VIOLATION SHALL BE THE SOLE, UNILATERAL AND EXCLUSIVE DECISION OF THE AUTHORIZED EMPLOYEE AND SHALL BE MADE IN SUCH AUTHORIZED EMPLOYEE'S SOLE DISCRETION (A "NOTICE OF VIOLATION DECISION"), AND IN NO EVENT SHALL VENDOR HAVE THE ABILITY OR AUTHORIZATION TO MAKE A NOTICE OF VIOLATION DECISION.

**E. Creation of City's Standards for Sorting Images.**

Central to the issue of unfettered discretion in this case are certain guidelines, which the City and Vendor call the "Business Rules Questionnaire."

8

The guidelines govern the Vendor's task of checking the "A" and "B" shots and the video clip. The guidelines were created by a process in which the Vendor identified scenarios or decision points and suggested alternative solutions to the City. For the most part, the City selected one of the alternative solutions suggested by the Vendor, but in several instances, the City created its own solutions.

For example, guideline 4.1 concerns the line of demarcation, which means the boundary of the intersection. This is the line used to evaluate the "A" shot, which is the photograph that shows the vehicle approaching the intersection. In reviewing this guideline, one must keep in mind that if the front tires of a vehicle crossed the boundary and entered the intersection when the light is still displaying green, the vehicle obviously is not running a red light. Conversely, if the front tires had not yet reached this line when the light displays red, the vehicle would appear to be running a red light (assuming the vehicle does not immediately stop within the edge of the intersection and wait for a green light). All of the City intersections containing red light cameras have painted stop lines. The Vendor provided four alternative suggestions for the line of demarcation: (1) the stop line; (2) the prolongation of the curb; (3) the crosswalk; and (4) whichever line the tires will hit first. The City adopted the first suggestion: the line of demarcation is the painted stop line. A similar process was followed for the other guidelines.

**F. Police Decision to Issue Citation.**

9

The police officers assigned to red light camera enforcement access the working database by logging into the server using their own unique user identification and password. The officers decide to issue a citation based on the images in the same manner they decide to issue a roadside citation. If, after reviewing the photographs, video, and other information, the officer decides to issue a citation, the officer clicks the "accept" button on the screen. By doing so, the officer authorizes his or her electronic signature and badge number to appear on the notice and citation. The officer's review and determination in this regard is far from a mere rubber stamp. As the trial court expressly found, "[o]f the images reviewed by the City's police officers, only between sixty-five percent (65%) and seventy percent (70%) are approved as a violation."

**G. Probable Cause in Jimenez's case.**

An example of the nature and extent of the police officer's review is provided by the issuance of Jimenez's citation for turning right on red at an intersection marked no-turns-on-red. Jimenez's ticket was issued by Officer Jeanette Castro, a thirteen-year veteran of the City Police Department who has issued thousands of traffic citations roadside, and hundreds as part of the red light camera program. Her badge number and electronic signature appear on the notice and citation. Officer Castro explained her thought process in deciding why probable cause was demonstrated by the images in Jimenez's case:

**Q.     Can we see the video again and walk us through what you see as you watch the video?**

OFFICER CASTRO:     You see again the vehicle approaches the right turn.  At this point, the light is—like I stated, it's already been red for 5.7 seconds. He proceeds to—the vehicle proceeds to make a right-hand turn, and that oncoming traffic is moving.

**Q.     Was that the same video that you watched when you made your probable cause determination in this case?**

OFFICER CASTRO:     Yes.

**Q.     Again, you determined that there was probable cause that Mr. Jimenez had committed a red light infraction?**

OFFICER CASTRO:     Yes.

**Q.     Did anyone else make that determination?**

OFFICER CASTRO:     No.

**Q.     Can you describe again the factors that you considered in making that determination?**

OFFICER CASTRO:     The fact that the light was indeed red, that it was a no turn on red intersection, that the vehicle proceeds to make the right-hand turn through the intersection while the light is red.

**Q.     You considered that to be a violation of the red light statutes?**

OFFICER CASTRO:     Yes, I do.

**Q.     You made that determination as a law enforcement officer based on your interpretation of those red light statutes?**

OFFICER CASTRO:     Yes.

Officer Castro testified that her decision to issue a citation to Jimenez was based on the same factors and criteria she uses when she issues a citation for a similar roadside violation.

### H. Vendor's Involvement in Printing, Mailing, and Processing Notices and Citations.

The record reflects the Vendor plays an important role in administering the printing, mailing, and electronic delivery of the notice and citation. The officer records in the City's computers his or her determination that probable cause exists and that a notice and citation will issue. That decision is immediately communicated to the Vendor's computers and triggers a pre-programed, automated process of printing and mailing the notice. If the required payments or affidavits are not received within the statutory deadlines, the Vendor's system then automatically prints and mails the citation. The Vendor's system also automatically delivers an electronic copy of the citation to the Clerk of the Courts, who creates a court file. The forms of the notice and citation are provided by the City. The information on the notice and citation are approved by the officer when she or he authorizes the issuance. Once triggered by the police officer, the officer does not view the notice or citation again before it is sent out. Also, once triggered by the police officer, this process involves no exercise of judgment or discretion on the part of the Vendor.

**I. Trial Court's Decision and Certification of Questions of Great Public Importance.**

After an evidentiary hearing, the trial court issued an opinion that made extensive and detailed findings of fact which neither side challenged on appeal. Citing to Arem, in which the Fourth District dismissed a traffic citation on the grounds that a city's process of using red light cameras gave unfettered discretion to a vendor, the trial court quashed Jimenez's traffic citation. The trial court, however, determined that the Vendor's actions in printing and mailing the notice and citation to Jimenez, and in delivering an electronic copy of the citation to the clerk, did not involve unfettered discretion. The trial court certified to this court the following issues:

1. Does the review of red light camera images authorized by Florida Statute 316.0083(1)(a) allow a municipality's vendor, as its agent, to review and then select which images to forward to the law enforcement officer, where the municipality has provided the vendor with specific written guidelines for determining which images to forward or not to forward?

2. If the vendor is permitted to review and then forward images in accordance with a municipality's written guidelines, is it an illegal delegation of police power for the vendor to print and mail the [citation], through a totally automated process without human involvement, after the law enforcement officer has affirmatively made a probable cause determination and authorizes the prosecution of the violation by selecting the "accept" button?

3. Does the fact that the [citation] data is electronically transmitted to the Clerk of the Court from the vendor's server via a totally automated process without human involvement violate Florida Statute §316.650(3)(c) when it is the law enforcement officer who

13

affirmatively authorizes the transmission process by selecting the "accept" button?

The City and the Attorney General appealed. We accepted the questions for review and therefore have jurisdiction. Art. V, § 6, Fla. Const.; § 34.017(1) & (2), Fla. Stat. (2015).

## ANALYSIS

### A. Certified Question Number 1: the Vendor's Sorting of Images.

The trial court's first certified question reads:

Does the review of red light camera images authorized by Florida Statute 316.0083(1)(a) allow a municipality's vendor, as its agent, to review and then select which images to forward to the law enforcement officer, where the municipality has provided the vendor with specific written guidelines for determining which images to forward or not to forward?

In regards to this certified question, Jimenez's main argument is that the guidelines allow the Vendor unfettered discretion to place items into the non-working database where they are never reviewed by the police for purposes of issuing citations.[2] The starting point for this argument is the language in the

---

[2] Jimenez also argues that the creation of the guidelines reflects unfettered discretion by the Vendor. The Vendor's suggestion of a range of options that included solutions diametrically opposed to one another falls far short of establishing as a matter of law that the Vendor exercised unfettered discretion in the creation of the standards. In fact, in at least two guidelines (4.3 and 4.4), the City added requirements to the guidelines without Vendor input. There is nothing illegal in government obtaining input from private parties in these circumstances. See generally, Walker v. Trump, 549 So. 2d 1098, 1102 (Fla. 4th DCA 1989) ("[T]he supreme court has held that there is no prohibition on the use of outside appraisers to assist the property appraiser in fulfilling her function, since such

14

Wandall Act authorizing the City to use "agents" to "review" the information generated by the red light traffic program "before issuance of the traffic citation by the traffic infraction enforcement officer." § 316.0083(1)(a), Fla. Stat.

In his brief, Jimenez acknowledged that "it makes perfect sense for the Legislature to have allowed the private entity to 'review' this evidence [generated by the red light camera program] to ensure that it is usable." Jimenez therefore essentially conceded that the term "review" as used in the statutes, connotes not just viewing, but also some modicum of assessment. To be sure, it is hard to deny that the legal term "review" indicates some level of evaluation: the Florida Constitution, after all, uses the term "review" when establishing the jurisdiction of the Supreme Court and district courts. Art. V, §§ 3(b) & 4(b).

Nevertheless, behind the statutory term "review" is the principle of law that a city's legislative body cannot delegate its legislative function by investing unbridled discretion in an administrative agency, government official, or private party. See, e.g, Arem, 154 So. 3d 359; Cty. of Volusia v. City of Deltona, 925 So. 2d 340, 345 (Fla. 5th DCA 2006); City of Belleview v. Belleview Fire Fighters, Inc., 367 So. 2d 1086, 1088 (Fla. 1st DCA 1979); Amara v. Town of Daytona Beach Shores, 181 So. 2d 722, 724 (Fla. 1st DCA 1966) ("Licensing ordinances must prescribe definite rules and conditions which the applicant shall meet and

appraisals produced by outside firms are not binding upon the property appraiser but may serve as a guide.").

may not leave the determination of the applicant's fitness or suitability to the undirected and uncontrolled discretion of even the licensing authority.").

At the same time, a government entity can outsource services and use private vendors, provided the essential decisions regarding the exercise of government power are retained by the government or controlled by that body through the promulgation of standards that prevent the private party from having unfettered discretion in the exercise of governmental power. See St. Johns Cty. v. N.E. Fla. Builders Ass'n, Inc., 583 So. 2d 635, 642 (Fla. 1991) (upholding a county impact fee for school infrastructure that authorized the School Board to spend the fees collected "because the fundamental policy decisions have been made by the county, and the discretion of the school board has been sufficiently limited"); Cty. Collection Servs., Inc. v. Charnock, 789 So. 2d 1109, 1112 (Fla. 4th DCA 2001) (upholding a contract in which a county hired a private entity to collect code enforcement liens because the private entity was not given unfettered discretion). See generally Citizens of State of Fla. v. Wilson, 567 So. 2d 889, 892 (Fla. 1990) (upholding a delegation of the authority to grant a rate increase to its staff because "[t]he Commission specified the conditions for approval, and the staff merely carried out the ministerial task of seeing whether these conditions were met").

The question thus becomes whether the Vendor's review in this case involves the exercise of unfettered discretion. We hold that it does not. The record

16

reflects that the type of evaluation exercised in the Vendor's decisions is clerical and ministerial. When sorting images into the working and non-working databases, the Vendor separates the images that are usable because they contain certain easy-to-ascertain information, from those that are not usable because they fail to contain that information. For example, the Vendor exercises no unfettered discretion when it determines the camera misfired, the traffic light in the image displays green, or the vehicle license plate number in the image is illegible.

Nor is unfettered discretion involved when the Vendor sorts images under the main guideline, guideline 4.1.[3] This guideline requires the Vendor to identify images in which the vehicle's front tires are behind (have not reached) the painted stop line and the light displays red. Whether a photograph shows that the front tires have reached a line painted on the pavement is a purely ministerial observation. In the overwhelming majority of the cases, the answer is a simple yes or no. In the few instances where there might be a close call, for example, where the front tires are barely touching, on, or over the painted line, guideline 4.2 further eliminates any discretion by directing that those images must always be placed in the working database for police review. Moreover, this guideline, like the others, is interpreted

---

[3] We note that although Jimenez's violation squarely falls under guideline 4.5, which deals with right turns on red at intersections marked no-turns-on-red by giving the address of those intersections, he challenges the validity of the City's entire red light camera program and all guidelines. As no party raised the issue of whether Jimenez has standing to challenge the other guidelines, we do not address this issue.

under the principle, "when in doubt, send it out." In other words, if there is any doubt, the Vendor will send it to the police for review. We find no unfettered discretion in the Vendor's sorting in this regard.

Similarly, it is hard to imagine a more ministerial act than deciding whether a traffic light in a photograph is displaying red. Determining whether a picture of a traffic light shows red involves no discretionary judgment. The answer is either yes, the traffic light in the photograph is displaying red, or no, the traffic light in the image is not displaying red. In the few instances where there might be close calls, involving traffic lights with strobes or incandescent bulbs, guidelines 4.6 and 4.7 require those events always to be placed in the working database for police review. Again, the Vendor's decision involves no exercise of unfettered discretion.

Guideline 4.4 governing right turns on red also directs the Vendor to sort into the working database for police review images demonstrating the following events: (1) traffic light displays red; (2) vehicle turns right without stopping; and (3) speed over 15 mph. Determining speed involves no judgment because the Vendor merely documents the figure recorded on a sensor in the pavement. The task of following these bright-line instructions involves no unfettered discretion.

Jimenez contends that unfettered discretion is involved in guideline 4.3, which concerns the "B" shot for vehicles allegedly running a red light while turning left and towing a trailer. The first part of guideline 4.3 is straightforward.

18

The City directs the Vendor to place into the working database only events where the "B" shot shows the entire vehicle crossed the painted stop line. That decision involves no unfettered discretion.

But the City also created an exception for vehicles pulling trailers. In this situation, even if the "B" shot does not show the entire trailer over the painted stop line, the City directed the Vendor to process the plates (which means obtain identification from the Department of Motor Vehicles) and place the event in the working database for police review "if the video supports violation." Taken out of context, this language might appear to give the Vendor the authority to decide whether a violation occurred. Understood in context, however, this language does no such thing. A supervisor of the Vendor testified that this language means that the event is to be placed in the working database, if the video shows the entire vehicle, including the trailer, crosses the painted line on the pavement and proceeds through the intersection. We find no unfettered discretion in an evaluation of a video to determine if such an easily observable event occurred.

Jimenez also contends unfettered discretion is involved in guideline 4.7, which concerns vehicles running the red light and turning left in the circumstances where no video clip exists. This guideline requires the Vendor to place the event in the working database "if the A-shot and the B-shot provide sufficient evidence of the violation." Again, taken out of context, this language might appear to give the

Vendor the authority to decide whether a violation occurred. Understood in context, however, this language does not do so. The sergeant in charge of City's program testified that "sufficient evidence of a violation" refers to whether guidelines 4.1 and 4.2 are met. He testified this means "the A-shot was before the stop bar and in the B-shot is already passed through the intersection." The determination whether the images reflect these characteristics involves no discretion. Moreover, the sergeant testified that he had never encountered a situation where this exception would apply because he had never seen an event where the video failed.

Nine of the remaining guidelines concern certain easy-to-recognize scenarios, for example, events involving police, fire, emergency, and municipal vehicles. The guidelines direct the Vendor to always sort these images into the working database for police review. Clearly, there is no unfettered discretion in guidelines that require the Vendor to always sort these scenarios into the working database.

Moreover, a representative of the Vendor involved in applying these guidelines testified that the Vendor's employees do not exercise discretion. They simply follow the instructions as established by the guidelines. They are taught "when in doubt, send it out," meaning if there is any question, they put the images in the working database for the police to review and decide. Regarding any near or

close calls, the representative testified, "We don't make those determinations. We're just going to send it to the police." Similarly, any images involving situations not addressed by the guidelines are always put in the working database for police review.

Not only do the bright-line standards promulgated by the City ensure the Vendor's tasks regarding images are purely ministerial and non-discretionary in nature, but the record reflects that no notice or citation is issued unless and until an individual officer of the City weighs the evidence in the images and determines in his or her professional judgment that probable cause exists. The officers make these decisions in the same manner they decide to issue a roadside citation.

The police officers assigned to red light camera enforcement access the working data base by logging into the server using their own unique user identification and password. If, after reviewing the photographs, video, and other information, the officer decides to issue a citation, the officer clicks the "accept" button on the screen. By doing so, the officer authorizes his or her electronic signature and badge number to appear on the notice and citation. The officer's review and determination in this regard are far from a mere rubber stamp. As the trial court expressly found, "[o]f the images reviewed by the City's police officers, only between sixty-five percent (65%) and seventy percent (70%) are approved as a violation." Officer Castro's testimony of the manner in which she evaluated

Jimenez's video and found probable cause dovetailed precisely with the other evidence presented in this regard.

In making his arguments, Jimenez places primary reliance on the Fourth District's decision in Arem. In Arem, the court announced the principle of law that a city's red light program violates the statutory provision that allows the city to use "agents" to "review" the information generated by the red light traffic program "before issuance of the traffic citation by the traffic infraction enforcement officer" if the vendor is given unfettered discretion to determine who will receive citations. 154 So. 3d at 364-65. We agree with the Fourth District's statement of the controlling principle of law.

In Arem, the Fourth District applied this principle to quash a citation issued by the City of Hollywood expressly because, under the facts of that case, the Vendor was given such unfettered discretion. While the vendor in Arem was the same one involved in the instant case, any similarity between the facts of the two cases ends there. In particular, Arem is distinguished from the instant case because there was a different contract, there were no standards or guidelines promulgated by the municipality, the Vendor determined probable cause, and the City officer merely acquiesced in the Vendor's determination.

**Different Contract.** The contract in Arem gave the Vendor broad discretion to "make the initial determination that the image meets the requirements of the

Ordinance and this Agreement." Id. at 365. The court in Arem expressly relied upon this contract language when it held the Vendor was making decisions "in its sole discretion." Id. In fact, the ultimate holding in Arem is that the "process set forth in the contract between the City and [the Vendor] does not comply with Florida Statutes." Id.

In contrast, unlike the contract language analyzed in Arem, the governing contract here strictly limits the Vendor only to "an initial determination of whether the recorded images should be forwarded to an Authorized Employee to determine whether an infraction has occurred." The contract in this case expressly provides that the police officer, and only the police officer, determines probable cause:

> THE DECISION TO ISSUE A NOTICE OF VIOLATION SHALL BE THE SOLE, UNILATERAL AND EXCLUSIVE DECISION OF THE AUTHORIZED EMPLOYEE AND SHALL BE MADE IN SUCH AUTHORIZED EMPLOYEE'S SOLE DISCRETION (A "NOTICE OF VIOLATION DECISION"), AND IN NO EVENT SHALL VENDOR HAVE THE ABILITY OR AUTHORIZATION TO MAKE A NOTICE OF VIOLATION DECISION.

**No Standards.** In the Fourth District's Arem opinion, there is a total absence of any consideration of guidelines promulgated by the City. In contrast, the record in this case includes guidelines and extensive testimony regarding how the specific City-established guidelines cabin the Vendor's tasks and limit the Vendor to purely ministerial, non-discretionary decisions.

23

**Vendor's Sole Discretion.** According to the Fourth District's opinion, the facts in Arem reflected that "the vendor unilaterally determines in its own discretion that either a violation did not occur or that the City would not be able to sustain its burden of proof." Id. at 365 n.2. The Fourth District repeatedly noted that, in the record before it, the Vendor not only had the authority to make the decision whether a violation occurred but that the Vendor had the authority to do so "unilaterally," based on "unfettered discretion," "its own discretion," and "in its sole discretion." Id. at 365.

In contrast, in the instant case, the Vendor was prohibited from deciding whether a violation had occurred. Instead, the Vendor here was limited to identifying whether the image contained specific and easy-to-identify features, such as a red traffic light and front tires behind (meaning not having reached) a painted line on the pavement, or whether a video shows that a vehicle pulling a trailer had traveled through the intersection. Moreover, the Vendor in this case operated under a protocol to sort into the working database any scenarios that were unclear ("when in doubt, send it out") and any scenarios not expressly addressed in the guidelines. Thus, unlike the Vendor's decisions in Arem which involved "unfettered discretion" to decide whether a violation occurred, the Vendor's decisions here were ministerial and non-discretionary. As the trial court found, "the

24

sole, unilateral, and unfettered decision making found unacceptable in Arem does not exist in this case."

**Officer "Merely Acquiesces."** Most importantly, in Arem, the police officer did not conduct an independent review of whether probable cause existed to issue a citation. Instead, as the Fourth District expressly determined, the officer "merely acquiesces in the vendor's decision to issue the citation." Id. at 365. In contrast, in the instant case, the Vendor has no authority to decide that a citation will issue. Only the police officer, whose name and badge number appears on the citation, decides if probable cause exists and if a notice and citation issues. This decision is reached in the same manner that the police officer decides to issue a roadside ticket. Unlike the officers in Arem, the officers in the instant case clearly do not "merely acquiesce[] in the vendor's decision to issue a citation." To the contrary, and as the trial court found below, "[o]f the images reviewed by the City's police officers, only between sixty-five percent (65%) and seventy percent (70%) are approved as a violation."

In summary, we agree Arem was properly decided given the record as reflected in the Arem opinion. Because of the vastly different record in this case, however, we find Arem clearly distinguishable. For all the reasons discussed above, we answer the first certified question in the affirmative.

**B. Certified Question Number 2: the Vendor's Printing and Mailing of Notices and Citations.**

25

The trial court's second certified question reads:

If the vendor is permitted to review and then forward images in accordance with a municipality's written guidelines, is it an illegal delegation of police power for the vendor to print and mail the [citation], through a totally automated process without human involvement, after the law enforcement officer has affirmatively made a probable cause determination and authorizes the prosecution of the violation by selecting the "accept" button?

Jimenez argues that the statutory language requiring the "issuance" of the notice and citation by an "officer" signifies that the officer who makes the probable cause decision must also print and mail the citation. § 316.0083(1)(a), Fla. Stat. Taken to its logical extreme, Jimenez's argument would require the officer to affix the stamps, seal the envelopes, and drop the items in the mailbox. The trial court rejected Jimenez's argument in this regard. In doing so, it found that, once the officer decides the citation will issue, "a fully automated computer program is triggered to print and mail the [notice and citation] based on the owner's failure to elect any of the options under the time frame contained in the statute. [The Vendor] only acts as an electronic apparatus to print and mail [the notice and citation]."

We agree with the trial court. Jimenez's argument conflates the non-delegable discretionary power to make the decision to issue the citation with the delegable clerical and ministerial task of delivering the citation. By way of analogy, the Florida Constitution similarly authorizes individual justices of the Florida Supreme Court, judges of the district courts, and judges of the circuit

26

courts to "issue" writs of habeas corpus. Art. V, §§ 3(b), 4(b), 5(b). Surely, an otherwise lawful writ would not be rendered unlawful because the issuing jurist did not personally print, seal, and mail the envelopes used to deliver the writ. Nor does the law require the writ to be delivered by a person under the immediate supervision or employ of the judge. See Fla. Bar v. Abreu, 833 So. 2d 752, 753 (Fla. 2002) (noting with approval that the Florida Supreme Court's order to show cause was served by a private process server). Likewise, we see nothing in the statutory language mandating that a sworn police officer, with years of specialized law enforcement training, must perform or directly supervise such clerical tasks.

Thus, we answer the second certified question in the negative. The statutory language providing that only an officer can issue a citation means that only an officer can make the discretionary decision that probable cause exists and the citation issues. Once that discretionary decision is made, nothing in the statutory language prohibits the police from delegating the clerical and ministerial task of delivering the notice and citation to administrative staff, independent contractors, or private vendors. See, e.g., Abreu, 833 So. 2d at 753.

## C. Certified Question Number 3: Use of the Vendor's Server to Provide an Electronic Copy to the Clerk.

The third question certified by the trial court reads as follows:

Does the fact that the [citation] data is electronically transmitted to the Clerk of the Court from the vendor's server via a totally automated process without human involvement violate Florida Statute

27

§316.650(3)(c) when it is the law enforcement officer who affirmatively authorizes the transmission process by selecting the "accept" button?

Jimenez contends that the language in the controlling statute stating that the "officer shall provide by electronic transmission a replica of the traffic citation date to the court having jurisdiction" means that the officer cannot use the clerical and ministerial services of the Vendor to provide the electronic copy to the Court. The trial court rejected this argument: "This Court finds that the process by which red light camera E-citations are transmitted is no different than how other E-citations are transmitted when an officer issues the [citation] roadside . . . therefore, the fact that the computer program that actually sends the data is that of a vendor does not violate the statute." Again, we agree with the trial court.

We see nothing in the statutory language indicating any legislative intent to bar law enforcement from using third-party software and servers to accomplish these ministerial and clerical tasks. See generally Frazier v. State, 180 So. 3d 1067 (Fla. 5th DCA 2015) (recognizing the legality of the police making use of third party vendor software to aggregate public information when the same task could otherwise be performed manually by law enforcement, albeit at a slower and less efficient pace). To read such a requirement into the statute, where it does not exist, would serve only to waste limited law enforcement resources and taxpayer dollars. We therefore answer the question in the negative.

## CERTIFICATION OF GREAT PUBLIC IMPORTANCE

Because the lawful use of cameras to enforce red lights has attracted the attention of the public, local governments, and the Legislature, we certify the following issues, which we have answered in this opinion, pursuant to Article V, section 3(b)(4) of the Florida Constitution as having great public importance:

1. Does the review of red light camera images authorized by section 316.0083(1)(a), Florida Statutes (2014), allow a municipality's vendor, as its agent, to sort images to forward to the law enforcement officer, where the controlling contract and City guidelines limit the Vendor to deciding whether the images contain certain easy-to-identify characteristics and where only the law enforcement officer makes the determinations whether probable cause exists and whether to issue a notice of violation and citation?

2. Is it an illegal delegation of police power for the vendor to print and mail the notices and citation, through a totally automated process without human involvement, after the law enforcement officer makes the determinations that probable cause exists and to issue a notice of violation and citation?

3. Does the fact that the citation data is electronically transmitted to the Clerk of the Court from the vendor's server via a totally automated process without human involvement violate section 316.650(3)(c), Florida Statutes (2014), when it is the law enforcement officer who affirmatively authorizes the transmission process?

Affirmed in part; reversed in part; questions of great public importance certified; and remanded for further proceedings consistent with this opinion.

EMAS, J., concurs.

29

WELLS, Judge, (specially concurring).

I agree with the majority that the first of the three certified questions must be answered in the affirmative and the remaining two questions must be answered in the negative. I do so for the following reasons.

First, section 316.0083 of the Florida Statutes authorizes, and provides basic procedures for local governments to utilize automated devices, that is, computer operated cameras, to enforce laws regulating conduct at traffic lights. See § 316.0083, Fla. Stat. (2010) (authorizing use of cameras to enforce traffic light violations; providing for notice of violations to be sent to vehicle owners; providing for exemptions from liability; providing for challenges to purported violations at an administrative hearing; and providing for appeals from adverse administrative hearing determinations). As pertinent here, this law expressly authorizes law enforcement agencies responsible for enforcing traffic laws to

30

utilize agents to screen images secured by automated devices before issuance of a traffic violation citation by a traffic infraction enforcement officer:

> For purposes of administering this section, the department, a county, or a municipality may authorize a traffic infraction enforcement officer under s. 316.640 to issue a traffic citation for a violation of s. 316.074(1) or 316.075(1)(c)1. . . . This paragraph does not prohibit a review of information from a traffic infraction detector by an authorized employee or agent of the department, a county, or a municipality before issuance of the traffic citation by the traffic infraction enforcement officer.

§ 316.0083(1)(a), Fla. Stat. (2015).[4]

In keeping with this provision, in 2010, Aventura amended its contract with American Traffic Solutions, Inc., the agent selected to operate Aventura's computerized red-light camera system. That contract as amended accorded American the limited authority to screen images of vehicles taken at designated intersections in the city:

> [American] shall act as City's agent for the limited purpose of making an initial determination of whether the recorded images should be forwarded to an authorized [City] employee to determine whether an infraction has occurred and shall not forward for processing those

---

[4] See also § 316.074(1), Fla. Stat. (2105) (requiring drivers to obey the instructions of any official traffic control device unless directed otherwise by a police officer); § 316.075(1), Fla. Stat. (2015) (requiring drivers generally to obey traffic control devices "exhibiting different colored lights"); § 316.640(3), Fla. Stat. (2015) (providing for traffic laws to be enforced in municipalities by local police and sheriff's department officers); § 316.640(5)(a), Fla. Stat. (2015) (expressly authorizing municipal law enforcement agencies to employ "any individual who successfully completes instruction in traffic enforcement procedures and court presentation" to issue citations for traffic law infractions).

recorded images that clearly fail to establish the occurrence of an infraction.

In conjunction with this agreement, Aventura adopted a number of guidelines pursuant to which American was to screen images as authorized by the Aventura/American contract.

With regard to the screening of images that might show a vehicle running a red light for example, the guidelines promulgated by Aventura generally require American to screen images of vehicles at electronically monitored intersections by examining images of vehicles' tires in relationship to lines demarking an intersection. Specifically, under Aventura's guidelines, American screeners are to examine still images taken after a traffic light has turned red ("shot A") which depict the position of a vehicle's front tires. If that image shows a vehicle's front tires either on or slightly over the line demarking an intersection, a video clip of the same vehicle is examined to confirm that the front tires were either on or slightly over the demarcation line when the light turned red. If so, American is not to pass on the images to a traffic infraction enforcement officer as there is no photographic support for the conclusion an infraction has occurred. However, if video clip shows that the tires were behind the line when the light turned red, the images are to be passed on to a traffic infraction enforcement officer to determine whether a traffic infraction had occurred.[5]

_____

[5] This is but one example of the guidelines adopted by Aventura to address

In my opinion, this constitutes no more than the "screening" expressly authorized by the law. That is especially so here because the testimony was that Aventura's traffic infraction enforcement officers do not simply rubber stamp recommendations or determinations made by American. To the contrary, the record is that Aventura's traffic infraction enforcement officers historically have determined that only sixty-five percent of the images forwarded by American evidence an infraction warranting issuance of a traffic citation. For this reason alone, I reject the notion advanced by our sister court in City of Hollywood v. Arem, 154 So. 3d 359 (Fla. 4th DCA 2014), that by allowing a servicing agent to forward pre-screened images to a traffic infraction enforcement officer that the servicing agent "[f]or all practical purposes" determines who is subject to prosecution for a red light violation.

The record in this case establishes that at most the servicing agent has been accorded only the ministerial authority to screen and cull those images which, pursuant to a rigid set of guidelines, clearly show no possible violation of the traffic laws; it is the traffic infraction officer alone who determines from the population of possible violators, those who will be subject to prosecution. This, in my opinion, is neither a violation of the law nor a matter about which those cited

screening procedures with regard to a number of other potential traffic violations. By way of example only, Aventura has adopted guidelines for screening images of long vehicles and vehicles towing trailers and for screening images of vehicles making right turns on red.

33

for a violation have authority to complain. Put another way, the real issue here is that some individuals who may have violated traffic regulations may be screened out of the process because the images of their vehicles were not sent to a traffic infraction enforcement officer to determine if a violation has occurred. This argument is no different than that made by an individual issued a speeding ticket who complains that other speeders also were not ticketed. In short, the fact that American determines certain images will not be forwarded—i.e., that some drivers will not be ticketed—because images taken of their vehicles show that they have not exceeded set guidelines, does not amount to determining whether those drivers who potentially exceed those guidelines have violated the law. That determination, as the record before us confirms, is left solely to traffic infraction enforcement officers. I therefore agree with the majority that the answer to the first certified question is "yes."

I also agree with the majority that in today's computerized world, the answers to the second and third certified questions as to whether it is illegal for American to print and mail a citation issued by a traffic infraction enforcement officer, clearly is "no." Pursuant to Aventura's guidelines, after a traffic infraction enforcement officer receives images from American, the officer independently reviews the images to determine whether an infraction has occurred. If the officer determines that the image depicts an infraction, the officer electronically indicates

34

that he or she accepts that an infraction has occurred and electronically issues the notice of infraction by authorizing American to send a notice of violation bearing the officer's badge number and signature. American then uses a form approved by the State of Florida. The clerk of the court is also notified electronically by American or one of its subsidiaries or vendors. As the testimony adduced below confirms, this is little different from what happens when an officer issues a violation roadside:

> **Q. So can you explain how that information is sent electronically, if you know?**
>
> A. It is sent electronically to [the clerk's office].
>
> **Q. Is that any different than any other electronic citation information that might be sent from roadside?**
>
> A. In the instance when it is sent from my computer roadside, it would go through my station's server and then to Miami-Dade Clerk of Courts.
>
> In the instance of these violations they – this officer approves them, the server – [American's] server in Arizona provides that information to the Miami-Dade Clerk of Courts.

In my opinion, to conclude that such ministerial acts are unauthorized by section 316.0083 would be akin to determining that a trial judge has no authority to instruct a judicial assistant to prepare a computerized order which the judge electronically signs and issues electronically to the parties and the clerk's office. Needless to say, this court determines and electronically transmits many matters

35

each day. It is the judges who decide the cases and issue their opinions, however it is the clerk's office which electronically sends those decisions on to the appropriate parties.

I also find no violation of section 316.0083 when American electronically "issues" a uniform traffic citation (as expressly authorized by Aventura with automatic notification to the court) when the owner of a vehicle fails to respond to a traffic citation as required by law. See § 316.0083(1)(b)1.a., Fla. Stat. (2015) (providing that "to avoid the issuance of a traffic citation," a vehicle owner notified of a violation must either pay a penalty, submit an affidavit, or request a hearing within 60 days of notification as provided in section 316.0083). Again, and at best, this is a non-discretionary function which takes no more than a computer program to perform.

In conclusion, because I agree that the first certified question as to whether section 316.0083 allows a municipality vendor to segregate images for forwarding to traffic infraction enforcement officers should be answered in the affirmative, and because I agree that the second and third certified questions about utilizing automated processes should be answered in the negative, I agree that the order entered below must be reversed. I would not, however, certify this matter to the Florida Supreme Court as a matter of exceptional importance as I do not believe

36

this matter is of such import as to warrant further review, but would certify this

decision as being in express and direct conflict with <u>Arem</u>.