NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

CITY OF OLDSMAR and PAMELA )
JO BONDI, Attorney General, )
                                  )
           Appellants, )
                                  )
v. )          Case No. 2D15-4898
                                  )
TAMMY VO TRINH, )
                                  )
          Appellee. )
_____ )

Opinion filed October 28, 2016.

Appeal from the County Court for
Pinellas County; William H. Overton,
Judge.

Edward G. Guedes and Samuel I.
Zeskind of Weiss Serota Helfman Cole
& Bierman, P.L., Coral Gables, for
Appellant City of Oldsmar.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Robert Dietz, Assistant
Attorney General, Tampa, for
Appellant Attorney General.

Joseph H. Lang, Jr., and Kevin P. McCoy
of Carlton Fields Jorden Burt, P.A.,
Tampa, for Amici Curiae, American
Traffic Solutions, Inc., and Xerox State
and Local Solutions, Inc.

Louis C. Arslanian, Hollywood, and Marc

A. Wites of Wites & Kapetan, P.A.,
Lighthouse Point, for Appellee.

WALLACE, Judge.

This case is before us for review of an order of the Pinellas County Court dismissing a citation for a red light camera violation. The primary issue that we are called upon to decide is whether a city has the authority under the Mark Wandall Traffic Safety Act[1] (the Act) to contract with a private vendor to screen data concerning potential red light camera violations before sending that data to the appropriate traffic enforcement authority for a probable cause determination.

The City of Oldsmar (the City) and the Attorney General challenge the county court's order granting Tammy Vo Trinh's motion to dismiss a red light camera citation and certifying two questions of great public importance under section 34.017, Florida Statutes (2015), and Florida Rule of Appellate Procedure 9.160.[2] Both the City and the Attorney General argue that the trial court erred in relying on the Fourth District's decision in City of Hollywood v. Arem, 154 So. 3d 359 (Fla. 4th DCA 2014) (on rehearing), rev. denied, 168 So. 3d 224 (Fla. 2015), to dismiss the citation under the particular facts of this case. Alternatively, the City and the Attorney General argue that

---

[1]Ch. 2010-80, §§ 1-18 at 552-65, Laws of Fla. The Act was incorporated into various sections of the Uniform Traffic Control Law. Id. But the main provisions of the Act, which establish how it operates and what entities may enforce it, are found at sections 316.0076, .008(7), and .0083, Florida Statutes (2013).

[2]Xerox State and Local Solutions, Inc., and American Traffic Solutions, Inc. (ATS), the third-party vendor for the City of Oldsmar, filed a friend of the court brief in support of the City's position.

<u>Arem</u> was wrongly decided.[3]  The City and the Attorney General argue further that even if the City's red light enforcement program violates the Act, the dismissal of Ms. Trinh's traffic citation was not an appropriate remedy.  Based upon our resolution of this case, we need not address this latter issue.

This court accepted jurisdiction from the county court in this matter.[4]  The certified questions are as follows:

> 1. DOES SECTION 316.0083(1)(a) AUTHORIZE A MUNICIPALITY TO CONTRACT WITH A THIRD PARTY VENDOR TO SORT IMAGES FROM A TRAFFIC INFRACTION DETECTOR SYSTEM INTO QUEUES BASED ON WRITTEN DIRECTIVES FROM THE MUNICIPALITY?
>
> 2. DO SECTIONS 316.640(5)(a) AND 316.0083, FLORIDA STATUTES, PROHIBIT A MUNICIPALITY FROM CONTRACTING WITH A THIRD PARTY VENDOR TO ELECTRONICALLY GENERATE AND MAIL A NOTICE OF VIOLATION AND UNIFORM TRAFFIC CITATION AFTER THE CITY'S TRAFFIC INFRACTION HEARING OFFICER FINDS PROBABLE CAUSE TO ISSUE A NOTICE OF VIOLATION AND AUTHORIZES THE VENDOR TO ELECTRONICALLY GENERATE AND MAIL THE NOTICE BY CLICKING "ACCEPT" IN THE SOFTWARE PROGRAM USED BY THE CITY AND VENDOR?

We answer the first certified question in the affirmative and the second certified question in the negative.  We also disagree with the Fourth District's decision in

---

[3]As discussed below, while this matter was pending, the Third District issued its decision in <u>State ex rel. City of Aventura v. Jimenez</u>, 41 Fla. L. Weekly D1753 (Fla. 3d DCA Jul. 27, 2016), which reaches substantially the same result as the one we reach here and certifies questions of great public importance to the Supreme Court of Florida.  Contrary to our view, however, the majority in <u>Jimenez</u> found the decision in <u>Arem</u> to be distinguishable from the case before it on its facts.

[4]Judge Samuel J. Salario is recused from any participation in this case. He did not participate in any of the discussions regarding it or in the decision to accept jurisdiction from the county court.

Arem to the extent it conflicts with our decision, and we certify conflict with Arem.

Accordingly, we reverse the order dismissing Ms. Trinh's red light camera citation,

remand for further proceedings, and certify conflict with Arem.

## I. THE MARK WANDALL TRAFFIC SAFETY ACT

Effective July 1, 2010, the Florida legislature enacted the Mark Wandall

Traffic Safety Act of the Florida Uniform Traffic Control Law.  Ch. 2010-80, §§ 1-18 at

552-65, Laws of Fla.[5]  "The Act was named in honor of Mark Wandall, who was killed by

a red-light runner when his wife was nine months pregnant."  City of Orlando v.

Udowychenko, 98 So. 3d 589, 596 n.10 (Fla. 5th DCA 2012).  In addition, the staff

analysis accompanying the Act reflected that in 2008, seventy-six people were killed in

Florida by drivers who ran red lights.  Fla. H.R. Comm. on Fin. & Tax Council,

CS/CS/HB 325 (2010) Staff Analysis 2 (Apr. 19, 2010) (citing Florida Traffic Crash

Statistics Report 2008, Dep't of Highway Safety & Motor Vehicles, June 30, 2009); see

also State ex rel. City of Aventura v. Jimenez, 41 Fla. L. Weekly D1753, D1753 (Fla. 3d

DCA Jul. 27, 2016) (noting same).

"The [Act] expressly preempt[s] to the State the regulation of the use of

cameras to enforce the provisions of chapter 316," and "[i]t authorize[s] the Department

of Highway Safety and Motor Vehicles, counties, and municipalities to use cameras to

---

[5]Before the passage of the Act, a number of cities passed municipal ordinances that imposed penalties for red light violations detected by devices using cameras.  In Masone v. City of Aventura, 147 So. 3d 492, 496 (Fla. 2014), the Supreme Court of Florida determined that these pre-Act ordinances, which "create[d] a municipal code enforcement system for the disposition of red light violations that [was] entirely separate from the enforcement system established under chapters 316 and 318," were not authorized under section 316.008(1)(w), Florida Statutes (2008), and were expressly preempted by sections 316.002 and 316.007.

enforce violations of sections 316.074(1) and 316.075(1)(c), Florida Statutes, for a

driver's failure to stop at a red light traffic signal." City of Fort Lauderdale v. Dhar, 185

So. 3d 1232, 1235 (Fla. 2016)[6]; see also §§ 316.0076, .0083(1)(a), Fla. Stat. (2013).

The Act provides further, in pertinent part, as follows:

> (1)(a) For purposes of administering this section, the department, a county, or a municipality may authorize a traffic infraction enforcement officer under s. 316.640 to issue a traffic citation for a violation of s. 316.074(1) or s. 316.075(1)(c)1.  A notice of violation and a traffic citation may not be issued for failure to stop at a red light if the driver is making a right-hand turn in a careful and prudent manner at an intersection where right-hand turns are permissible.  A notice of violation and a traffic citation may not be issued under this section if the driver of the vehicle came to a complete stop after crossing the stop line and before turning right if permissible at a red light, but failed to stop before crossing over the stop line or other point at which a stop is required.  This paragraph does not prohibit a review of information from a traffic infraction detector by an authorized employee or agent of the department, a county, or a municipality before issuance of the traffic citation by the traffic infraction enforcement officer.  This paragraph does not prohibit the department, a county, or a municipality from issuing notification as provided in paragraph (b) to the registered owner of the motor vehicle involved in the violation of s. 316.074(1) or s. 316.075(1)(c)1.

§ 316.0083 (emphasis added).  A "traffic infraction detector" is defined as follows:

> A vehicle sensor installed to work in conjunction with a traffic control signal and a camera or cameras synchronized to automatically record two or more sequenced photographic or electronic images or streaming video of only the rear of a motor vehicle at the time the vehicle fails to stop behind the stop bar or clearly marked stop line when facing a traffic control signal steady red light.

---

[6]In Dhar, the Supreme Court of Florida determined that section 316.0083 was unconstitutional as applied to short-term vehicle renters because "the unequal statutory treatment of short-term automobile renters bears no rational relationship to a legitimate state purpose."  185 So. 3d at 1236.

§ 316.003(87). In addition, a city

> may employ, as <u>a traffic infraction enforcement officer</u>, any individual who successfully completes instruction in traffic enforcement procedures and court presentation through the Selective Traffic Enforcement Program as approved by the Division of Criminal Justice Standards and Training of the Department of Law Enforcement, or through a similar program, but who does not necessarily otherwise meet the uniform minimum standards established by the Criminal Justice Standards and Training Commission for law enforcement officers or auxiliary law enforcement officers under s. 943.13.

§ 316.640(5)(a) (emphasis added).

## II. THE CITY'S RED LIGHT ENFORCEMENT PROGRAM

The parties stipulated that the City had entered into a contract with American Traffic Solutions, Inc. (ATS), to provide the City with camera equipment that records evidence of possible red light violations. ATS also provides the City with a software system, Axsis, to process the data that has been recorded and sent to the City for review. A copy of the Professional Services Agreement and an Amendment to Professional Services Agreement were entered into evidence at the hearing on Ms. Trinh's motion to dismiss and considered by the trial court. In addition, a copy of the Red Light & Speed Camera – Business Rules Questionnaire (BRQ) that was completed by the City for ATS was entered into evidence and considered by the trial court in rendering its decision. The City and ATS executed the contract in December 2011, after the effective date of the Act. They executed the amendment in July 2013.

The contract provides in pertinent part as follows:

### EXHIBIT B
### SCOPE OF WORK

### I. ATS SCOPE OF WORK

. . . .

**1.3 ATS OPERATIONS**

. . . .

1.3.2 **ATS** shall act as **Customer's** agent for the limited purpose of making an initial determination of whether **Recorded Images** should be forwarded to the **Traffic Infraction Enforcement Officer** to determine whether a **Violation** has occurred and shall not forward for processing those **Recorded Images** that clearly fail to establish the occurrence of a **Violation**.

. . . .

1.3.4 Upon expiration of the due date of the **Notice of Violation**, Axsis VPS shall issue a **Uniform Traffic Citation**, which shall be delivered by certified mail to the **Owner** within the statutory period. The issuance of the **Uniform Traffic Citation** shall be based on the **Traffic Infraction Enforcement Officer's** approval, as provided in Section 2.4 of this Exhibit B, Scope of Work, of the **Notice of Violation**.

. . . .

**II. CUSTOMER SCOPE OF WORK**

. . . .

**2.4 LAW ENFORCEMENT DEPARTMENT OPERATIONS**

2.4.1 **Customer's Traffic Infraction Enforcement Officer(s)** shall process each potential violation in accordance with State Law and/or Municipality Ordinances within three (3) business days of its appearance in the Law Enforcement Review Queue, using Axsis to determine which violations will be Issued as **Notices of Violation**.

. . . .

**EXHIBIT E**
**INFRACTION PROCESSING**

. . . .

3.  ATS shall act as Customer's agent for the limited purpose of making an initial determination of whether the recorded images should be forwarded to an Authorized Employee to determine whether an Infraction has occurred and shall not forward for processing those recorded images that clearly fail to establish the occurrence of an Infraction.

. . . .

7.  Within five (5) days of receipt, the Customer shall cause the Authorized Employee to review the Infractions Data to determine whether a Notice of Violation shall be issued with respect to each potential Infraction captured within such Infraction Data, and transmit each such determination to ATS using the software or other applications or procedures provided by ATS on the ATS System for such purpose.  ATS HEREBY ACKNOWLEDGES AND AGREES THAT THE DECISION TO ISSUE A NOTICE OF VIOLATION SHALL BE THE SOLE, UNILATERAL AND EXCLUSIVE DECISION OF THE AUTHORIZED EMPLOYEE AND SHALL BE MADE IN SUCH AUTHORIZED EMPLOYEE'S SOLE DISCRETION (A "NOTICE OF VIOLATION DECISION"), AND IN NO EVENT SHALL ATS HAVE THE ABILITY OR AUTHORIZATION TO MAKE A NOTICE OF VIOLATION DECISION.

(Underlined emphasis added.)

At the hearing on Ms. Trinh's motion to dismiss, Debbie Duff, a senior manager for operations at ATS, explained how the system works and how the parties perform under the contract.  According to Ms. Duff, ATS's equipment records two still photographs and a video of each event.  The first still photograph, the "A-shot," shows a vehicle behind the stop line while the light is red, and the second photograph, the "B-shot," shows the vehicle in the intersection while the light is red.  The photographs also have a data bar that includes the time of day, the location, the speed of the vehicle, and

- 8 -

"the red time of the light."[7]  The video shows a twelve-second recording of the entire event.

Before sending any data to the City, an ATS processor reviews the recordings using the Axsis software and ensures that the three recordings are of the same vehicle and that the vehicle's license plate was captured.  The processor cannot alter the video, but the processor can zoom in or out of the photographs or lighten them.  The processor reviews each event "according to the City['s] rules" and "then determine[s] . . . how [to] categorize them, to pass them to the [City] or to put them into a – different type of categor[y] based on what the rules state for them to do."

According to Ms. Duff, the City's business rules direct the processors about what information the City wants and how to sort the information into queues, including a working queue and a nonworking queue.  Ms. Duff described this function as "administrative."  She stated that the processors do not make any probable cause determination or recommendation about whether a notice of violation or a citation should issue for an event.  In addition, the processors are trained that if they are ever in doubt about how to apply a business rule to an event, they should pass the event on for review by the City, i.e., to put the data into the working queue.  After a processor completes his or her review and the registered owner of the vehicle is identified by the

_____

[7]The term "the red time of the light" is not explained in Ms. Duff's testimony.  However, ATS's website states that its system "records multiple violation data, including . . . durations of the yellow and red lights."  American Traffic Solutions, Frequently Asked Questions, How do Road Safety Cameras Work (2016), https://atsol.com/media-center/faqs/.  In addition, the website, HowStuffWorks, explains that red light camera systems typically record "[t]he **elapsed time** between when the light turned red and the car entered the intersection."  Tom Harris, How Red-Light Cameras Work (2016), auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/red-light-camera2.htm.

Department of Motor Vehicles (the DMV), all of the raw data, including the information in the nonworking queue, is electronically transmitted to the City for its further review. Thus, the City has the ability to review the accuracy of the ATS processors' compliance with its business rules.

Each city that contracts with ATS establishes its own business rules for ATS to follow. For example, the City's business rule 4.1 defines a red light violation as occurring when a vehicle passes under a red light and the A-shot shows the vehicle's tires behind the stop line when the light is red. Among other things, the City's rules further direct processors to pass for review, or to place into the working queue, any event in which a video clip shows that the front tires of the vehicle are on or slightly over the stop line when the light turns red. Videos that record emergency vehicles passing through a red light with their lights on should be rejected, meaning that they are placed into the nonworking queue. Similarly, videos that show a flagman waving a vehicle through a red light or a funeral procession passing through a red light should be rejected. Processors receive one week of training followed by eight weeks of one-on-one review of their work. Thereafter, ATS audits each processor thirty times per week to ensure compliance with the City's business rules.

Ms. Trinh's counsel questioned Ms. Duff about the fact that ATS's contract with the City does not specifically incorporate the City's business rules. Ms. Duff relied upon two provisions of the contract in asserting that the business rules were part of the parties' contract. In the definition section of the contract, "Project Business Process Work Flow" is defined to "mean[] initial schedules and timelines required to begin the implementation of City's project." Then, under exhibit B to the contract setting out ATS's

- 10 -

scope of work concerning implementation, the contract provides at paragraph 1.2.8 that "**Customer** and **ATS** will complete the Project Business Rules Process Work Flow design within thirty (30) days of the **Effective Date**, unless mutually agreed to otherwise by both parties." According to Ms. Duff, these provisions made the business rules part of the parties' contract. More important, Ms. Duff explained that the processors would not be able to perform their function under the contract without the rules.

Defense counsel also questioned Ms. Duff about implementing the City's business rules and suggested that processors must exercise some discretion in determining whether a business rule has been met. Ms. Duff repeated that if there were any question about how a rule applied in a particular circumstance, processors are trained, "[w]hen in doubt, send it out," meaning that the data should be placed into the working queue for review by the City.

Defense counsel also established that the meaning of the language in some business rules may be subject to interpretation. For example, the City's business rule 6.3 states that when an event involves an emergency vehicle passing through an intersection on a red light with its lights off, the event should be passed for review. The rule states that "Emergency Vehicles Include[]: Police, Fire & Ambulance." Counsel asked if the rule would apply to a sheriff's vehicle even though "sheriff" did not appear on the list. Ms. Duff replied that she did not consider the list to be exhaustive and stated that she would include a sheriff's vehicle under the category of "Emergency Vehicles." She also explained that processors are allowed to interpret words in the business rules in accordance with their ordinary meaning. She was unaware of any instance in which the City's intent under its business rules was not being carried out by ATS's processors.

After the City receives data from ATS, a Traffic Infraction Enforcement Officer (TIEO) logs into the Axsis system using his or her user ID and password and reviews the events. The TIEO's user ID and password are linked to the TIEO's name and badge number. The TIEO can review the data in both the working queue and in the nonworking queue. The TIEO determines whether probable cause exists to issue a citation for any event. If the TIEO determines that probable cause exists, the TIEO clicks an electronic accept button.

The TIEO's acceptance causes the Axsis software to generate a notice of violation to the registered owner, using the data obtained from the DMV. The registered owner has several options for responding to the notice, including paying a fine or not responding. After the requisite period has passed for the registered owner to act on the notice, the Axsis software creates an electronic uniform traffic citation (UTC) by populating data into a form that the City created. The software also generates an electronic signature for the TIEO who logged into the system and made the probable cause determination, including that TIEO's name and badge number, which is appended to the UTC. The electronic UTC is saved to a portable document format (PDF file) and is electronically transmitted to ATS's third-party print vendor. The print vendor prints and mails the UTC to the address on the UTC and sends an electronic copy to the clerk of the court. Under this procedure, no one can receive a notice of violation or a UTC unless a TIEO first logs into the system and makes a determination of probable cause that a violation has occurred. Stated differently, an ATS processor cannot direct that anyone receive a notice of violation or a UTC.

### III. THE HISTORICAL AND PROCEDURAL FACTS IN THIS CASE

On April 17, 2014, the red light camera at the intersection of Forest Lakes Boulevard and Tampa Road in Oldsmar recorded a vehicle registered to Ms. Trinh passing through that intersection on a red light. It was undisputed that Ms. Trinh received a notice of violation, after which she did not pay the statutory fine or raise a statutory defense. On July 31, 2014, a UTC was issued to Ms. Trinh for a violation of section 316.075(1)(c)(1) as a result of her vehicle's "failure to stop at a red traffic signal." Deputy Jonathan Lopes signed the citation electronically with his computer-generated signature and badge number.

In March 2015, Ms. Trinh filed a motion to dismiss the citation. She argued that the City had impermissibly delegated its police power by allowing ATS to prescreen traffic infraction data before sending it to the City for review; that the City had improperly delegated to ATS the task of transmitting a replica of the traffic citation data to the clerk of the court; and that the county court was bound under the Fourth District's decision in Arem to dismiss the citation.[8] The county court held a hearing on the motion on May 29, 2015.

At the hearing, the county judge observed correctly that the Fourth District's decision in Arem was binding authority unless the facts in the case before it could be distinguished from the facts in Arem. See Pardo v. State, 596 So. 2d 665, 666 (Fla. 1992) ("[I]n the absence of interdistrict conflict, district court decisions bind all Florida trial courts."). Ms. Duff, ATS's representative, testified at the hearing; she described the functions performed by ATS under its contract with the City as stated in

---

[8]The issue about whether ATS's transmission of the UTC to the clerk of court constitutes an unauthorized delegation of police power is not before us in this appeal.

the preceding section of this opinion. The county court also reviewed the City's contract with ATS, the amendment to the contract, and the BRQ, which, according to Ms. Duff, set forth the business rules that ATS's processors were obligated to follow under its contract with the City. After Ms. Duff testified, the parties presented their closing arguments.

Defense counsel argued that the contract between ATS and the City in this case was nearly identical to the contract at issue in Arem and that under the terms of the contract, the City had improperly delegated its police power to ATS. Counsel argued that there was no evidence in this case that the TIEO had any involvement in the decision to issue a notice of violation or a UTC other than clicking the accept button on the computer. Counsel further argued that the existence of business rules were irrelevant in determining whether the City had improperly delegated its police authority because the business rules were not, in fact, included in the contract between ATS and the City; the City's business rules required the exercise of discretion by ATS's processors; and the Arem court found the rules under review in that case to be irrelevant to its decision. Finally, counsel argued that the issue was not whether ATS's processors had unfettered discretion under the contract with the City, but rather that the contract permitted the processors to prescreen events to determine whether a violation had occurred. Counsel acknowledged that the Act permits "review" of traffic infraction data before the issuance of a UTC by a TIEO, but argued that the prescreening function performed by ATS's processors is not authorized by the Act.

The trial court entered an order granting Ms. Trinh's motion to dismiss and certifying questions of great public importance. In its order, the trial court made factual

findings about ATS's functions under its contract with the City consistent with the testimony of ATS's representative.  And although it disagreed with the Arem court's decision, the trial court decided that it was bound by that decision to rule in Ms. Trinh's favor.  In so concluding, the trial court observed as follows:

> The evidence before the Court establishes that ATS performs the same procedures in this case at bar that were followed in Arem; an initial review of red light camera images, determines which images to send the TIEO, generates and mails the notice of violation, and generates and mails the UTC.  This Court finds there are no distinguishable facts or procedures and that this Court is compelled to follow Arem.

## IV. THE FOURTH DISTRICT'S DECISION IN AREM

The historical and procedural facts in the Fourth District's decision in Arem are similar to those in this case.  As discussed later, there are some differences in the language in the City of Hollywood's contract with ATS and that in the City's contract with ATS in this case.  Notably, it appears that the City of Hollywood entered into its contract with ATS either before the effective date of the Act, or, it entered into a contract that used language predating the Act.[9]  In addition, it is unclear whether an ATS representative provided testimony in Arem about how the parties operated under their contract.  Further, although it appears that the Arem court was aware that processors functioned under standards or guidelines, it is unclear to what extent the court reviewed

---

[9]The contract in Arem refers only to the requirements of the "Ordinance" rather than the statute, and, as noted above, the Supreme Court of Florida found in Masone v. City of Aventura, 147 So. 3d 492, 496 (Fla. 2014), that pre-Act municipal ordinances, which "create[d] a municipal code enforcement system for the disposition of red light violations that [was] entirely separate from the enforcement system established under chapters 316 and 318," were not authorized under section 316.008(1)(w), Florida Statutes (2008), and were expressly preempted by sections 316.002 and 316.007.

any business rules between the City of Hollywood and ATS in reaching its decision. Despite these factual and record differences, we find that the holding in Arem is not fully distinguishable from the case before us on its facts, and we disagree with the holding in Arem to the extent it conflicts with our decision.

As in this case, the City of Hollywood had entered into a contract with ATS for the provision of red light cameras and a computerized system to record images to determine the occurrence of potential red light violations. Under the City of Hollywood's red light camera program, a TIEO would review images forwarded by ATS. If the TIEO clicked a digital accept button, then ATS's computer program printed and mailed a notice of violation to the registered owner. If the registered owner failed to elect an option to avoid issuance of a traffic citation, ATS would then generate a UTC with the computer generated signature of the TIEO and the TIEO's badge number.

Upon his receipt of a UTC for a red light violation detected by and issued under the City of Hollywood's red light camera program with ATS, Eric Arem denied the violation and requested a trial. After hearing the testimony of the TIEO who issued the UTC, the county court found that the City of Hollywood's red light camera program did not comply with sections 316.0083(1)(a) and 316.650(3)(c)[10] because the City had improperly delegated various tasks to ATS. Accordingly, it dismissed the citation. Arem, 154 So. 3d at 362.

---

[10]Section 316.650(3)(c) provides that if a UTC is issued, "the traffic infraction enforcement officer shall provide by electronic transmission a replica of the traffic citation data to the court having jurisdiction over the alleged offense or its traffic violations bureau within 5 days after the date of issuance of the traffic citation to the violator." Whether section 316.650(3)(c) permits a city to delegate this task to a private vendor is not an issue in this appeal.

- 16 -

On appeal,[11] the district court held that the City of Hollywood was

> not authorized to delegate police power by entering into a contract that allow[ed] a private vendor <u>to screen data and [to] decide whether a violation has occurred before sending that data to a [TIEO] to use as the basis for authorizing a citation</u>. Such outsourcing to a third-party for-profit vendor of a city's statutorily mandated obligation to issue uniform traffic citations for red light camera violations is contrary to the plain wording of the Florida Statutes.

Id. at 361 (emphasis added).

In reaching its conclusion, the Fourth District observed that "[i]n Florida, only law enforcement officers and traffic enforcement officers have the legal authority to issue citations for traffic infractions, which means only law enforcement officers and traffic enforcement officers are entitled to determine who gets prosecuted for a red light violation." Id. at 364. In addition, "[a]lthough the legislature in section 316.0083(1)(a) did permit cities to delegate the *review* of information obtained from a traffic infraction detector, it did not permit cities to delegate their authority to *issue* any resulting traffic citations anywhere in these statutes." Id.

---

[11]As in this case, the county court certified questions of great public importance to the district court, and the district court accepted jurisdiction. The district court only addressed two of the certified questions, which were as follows:
> 1. Does Florida Statute 316.0083(1)(a) authorize a municipality to delegate and have a private vendor actually issue Florida Uniform Traffic Citations, when notices of violation, (also issued by the vendor), are not complied with, where the only involvement of the traffic infraction enforcement officer in the entire process is to push a button saying "Accept" after having viewed the image of an alleged violation electronically transmitted by the vendor?
> . . . .
> 3. And if the answer is in the negative to either question, is dismissal the appropriate remedy?

Id. at 360. The Arem court answered "no" to the first question and "yes" to the third question.

Applying these principles to the case before it, the Fourth District noted the county court's finding "that according to the City's standard protocol and in accord with the terms of its contract, ATS first reviews the video-captured images, yet ATS does not furnish them all to the City—*only those it deems to be suggestive of a violation.*" Id. at 364. The district court further observed that the contract between the City of Hollywood and ATS contained the following paragraph:

> 3. *The Vendor [ATS] shall make the initial determination* that the image meets the requirements of the Ordinance and this Agreement, and is otherwise sufficient to enable the City to meet its burden of Demonstrat[ing] a violation of the Ordinance. *If the Vendor determines that the standards are not met, the image shall not be processed any further.*

Id. at 364-65 (alterations in original). Thus, the district court found that

> the contract requires ATS to send images and information regarding the violation to the TIEO *only* if ATS determines in its sole discretion that certain standards have been met, and ATS may withhold sending information if it determines that those standards were not met. Only in the event that ATS determines that a violation has taken place is that information sent to the City.

Id. at 365 (footnote omitted).

In concluding that the City of Hollywood had delegated its authority to issue citations for red light violations, the court reasoned as follows:

> For all practical purposes, it is the *vendor* that decides which cases the TIEO gets to review; it is the *vendor* who initially determines who is subject to prosecution for a red light violation; it is the *vendor* that obtains the information necessary for the completion of the citation; it is the *vendor* that creates the actual citation; it is the *vendor* that issues the citation to the registered owner of the vehicle; and, it is the *vendor* that eventually transmits the traffic citation data to the court. As the trial court found, the TIEO[] merely acquiesces in the vendor's decision to issue the citation. The TIEO never sees the actual citation, nor does the TIEO

- 18 -

> personally sign the citation before it is issued by the vendor to the alleged violator. Although the City may have some input into who eventually is prosecuted, that decision is wholly dependent upon the vendor's initial determination. <u>Under these circumstances, it cannot be said that this is the legal equivalent of a TIEO issuing the citation, especially when it is the third-party vendor that controls what information is, or is not, made available for the officer's consideration</u>.

Id. at 365 (underlined emphasis added). Thus the Fourth District held that the City of Hollywood had "improperly delegated its police powers when it contractually outsourced its statutory obligations to a for-profit, non-governmental corporation" and that "[t]he process set forth in the contract between the City and ATS [did] not comply with Florida Statutes." Id. The court further held that because "the TIEO did not have authority to issue the citation," dismissal of the citation was the proper remedy. Id.

## V. THE THIRD DISTRICT'S DECISION IN <u>JIMENEZ</u>

While this matter was pending, the Third District issued its decision in <u>State ex rel. City of Aventura v. Jimenez</u>, 41 Fla. L. Weekly D1753 (Fla. 3d DCA Jul. 27, 2016), which reaches substantially the same result as the one we reach here on the issue of the alleged unauthorized delegation of a municipality's police power to issue citations for red light violations to a private vendor. ATS was also the private vendor that had contracted with the municipality in <u>Jimenez</u>. <u>Id.</u> at D1753. The <u>Jimenez</u> court noted that the heart of the dispute in the case before it was the "Act's express authorization for local governments to use 'agents' to 'review' images before the 'officer' issues a citation." <u>Id.</u>

In resolving this issue, the Jimenez court reviewed the contract[12] between the City of Aventura and ATS and the testimony of a representative from ATS, which established that the procedures followed by ATS and the City of Aventura are nearly identical to those followed by ATS and the City in this case. As in this case, ATS prescreened data recorded by its equipment and sorted it into working and nonworking queues in accordance with business rules selected and created by the City of Aventura. In addition, the data contained in both queues was available for review by the City of Aventura. Id. at D1754.

Ultimately, the court held that the review completed by ATS was authorized under the Act, stating as follows:

> [W]e hold that the review of red light camera images authorized by section 316.0083(1)(a) allows a municipality's vendor, as its agent, to review and sort images to forward to a police officer where, as here, (1) the vendor's decisions in this regard are strictly circumscribed by contract language, guidelines promulgated by the municipality, and actual practices, such that the vendor's decisions are essentially ministerial and non-discretionary; (2) these ministerial decisions are further limited by an overarching policy of automatically passing all close calls to the police for their review; (3) it is the police officer that makes the actual

---

[12]In Jimenez, the court had before it a 2008 contract between the City of Aventura and ATS that the parties had executed before the effective date of the Act. That contract contained the same language describing ATS's authority to review recorded data that was examined by the court in Arem. The Jimenez court compared the language in the 2008 contract to the language in the parties' 2010 amended contract, which is identical to the language in paragraphs 1.3.2 and 3 of the contract in this case. The Jimenez court found that the new language in the 2010 amendment "substantially narrow[ed] the nature and scope of the Vendor's role in the process." Id. at D1754. In addition, the amended contract contained language, as does paragraph seven of the contract in this case, which "expressly recognized that the Vendor had no authority to decide that a citation would issue." Id. Further, in Jimenez, the officer who issued the UTC to Mr. Jimenez testified and explained her thought process in reviewing the event involving Mr. Jimenez's vehicle and in determining that probable cause existed to issue the UTC. Id. at D1755.

decision whether probable cause exists and whether a notice and citation should issue; and (4) the officer's decision that probable cause exists and a citation issues consists of a full, professional review by an identified officer who is responsible for that decision and does not merely acquiesce in any determination made by the vendor.

Id. at D1753. In addition, the court certified the following questions of great public importance to the Florida Supreme Court:

> 1. Does the review of red light camera images authorized by section 316.0083(1)(a), Florida Statutes (2014), allow a municipality's vendor, as its agent, to sort images to forward to the law enforcement officer, where the controlling contract and City guidelines limit the Vendor to deciding whether the images contain certain easy-to-identify characteristics and where only the law enforcement officer makes the determinations whether probable cause exists and whether to issue a notice of violation and citation?

> 2. Is it an illegal delegation of police power for the vendor to print and mail the notices and citation, through a totally automated process without human involvement, after the law enforcement officer makes the determinations that probable cause exists and to issue a notice of violation and citation?

> 3. Does the fact that the citation data is electronically transmitted to the Clerk of the Court from the vendor's server via a totally automated process without human involvement violate section 316.650(3)(c), Florida Statutes (2014), when it is the law enforcement officer who affirmatively authorizes the transmission process?

Id. at D1758.[13]

However, the Jimenez court split on the question of whether the Fourth District's decision in Arem was distinguishable on its facts from the case before it. Judge Logue and Judge Emas agreed that the Fourth District reached a correct result "given the record as reflected in the Arem opinion." Id. at D1757. But they found Arem

---

[13]Only the first and second questions are at issue in this appeal.

- 21 -

to be distinguishable based on what they described as the "the vastly different record" in the case before the Third District. Id. On the other hand, Judge Wells would have certified the Third District's decision in Jimenez "as being in express and direct conflict with Arem." Id. at D1759 (Wells, J., specially concurring).

## VI. DISCUSSION

The legal issues in this case, although stated somewhat differently than in Arem, are substantially the same issues that were addressed in Arem. As in that case, we must determine whether section 316.0083(1)(a) authorized the City to contract with ATS to record and screen data of potential red light violations and then to process and mail a notice of violation and UTC to violators upon authorization by a TIEO.

On appeal, the City and the Attorney General argue that the pertinent facts in Arem can be distinguished from the facts of this case. Similarly, the Jimenez court found that the facts in Arem were distinguishable from the case before it because Arem involved "a different contract, there were no standards or guidelines promulgated by the municipality, the Vendor determined probable cause, and the City officer merely acquiesced in the Vendor's determination." 41 Fla. L. Weekly at D1757. We read Arem somewhat differently than the majority in Jimenez. While some of the purported factual findings by the Arem court that were noted in Jimenez represent clear factual findings made by the Arem court, other purported factual findings noted in Jimenez as being factual findings of the Arem court appear to be conclusions or characterizations that were drawn by the Arem court based upon the limited record before it.

Although the TIEO who issued the UTC in Arem testified, we note that the county and district courts in Arem apparently did not have the benefit of the testimony of

a representative from ATS to explain how the City of Hollywood's red light camera program worked.  Instead, it appears that the court's conclusions about ATS's review procedure in actual practice may have been drawn from certain language in the contract before it.  The contractual language at issue in Arem provided as follows:

> 3.  *The Vendor [ATS] shall make the initial determination* that the image meets the requirements of the Ordinance and this Agreement, and is otherwise sufficient to enable the City to meet its burden of Demonstrat[ing] a violation of the Ordinance.  *If the Vendor determines that the standards are not met, the image shall not be processed any further.*

154 So. 3d at 364-65 (alterations in original).  From this language, the Arem court found:

> [T]he contract requires ATS to send images and information regarding the violation to the TIEO *only* if ATS determines in its sole discretion that certain standards have been met, and ATS may withhold sending information if it determines that those standards were not met.  Only in the event that ATS determines that a violation has taken place is that information sent to the City.

Id. at 365 (footnote omitted).  From these findings and facts about how a UTC is created and transmitted to the vehicle owner and the clerk of the court after the TIEO accepts an event as constituting a violation, the Arem court reasoned:

> "For all practical purposes . . . the *vendor* . . . decides which cases the TIEO gets to review[,] . . . initially determines who is subject to prosecution for a red light violation[,] . . . obtains the information necessary for the completion of the citation[,] . . . creates the actual citation[,] . . . issues the citation to the registered owner of the vehicle[,] and . . . eventually transmits the traffic citation data to the court.

Id. (underlined emphasis added).  Thus, the Arem court concluded that the TIEO

"merely acquiesces in the vendor's decision to issue the citation."  Id.

We find, however, that the contractual language at issue in <u>Arem</u> is not entirely inconsistent with the review procedure as explained by ATS's representative in this case nor with the existence of business rules, as "standards," which guide ATS's processers in determining how to sort data. Further, in distinguishing the facts in <u>Arem</u>, the <u>Jimenez</u> court found it important that "in *Arem*, the police officer did not conduct an independent review of whether probable cause existed to issue a citation. Instead, [the <u>Jimenez</u> court observed,] the Fourth District expressly determined, the officer 'merely acquiesces in the vendor's decision to issue the citation.' " 41 Fla. L. Weekly at D1757 (quoting <u>Arem</u>, 154 So. 3d at 365). However, it is not entirely clear that the <u>Arem</u> court actually found as a matter of fact that under the contract between ATS and the City of Hollywood, the TIEO did not independently review data received from ATS to determine probable cause. Rather the court appears to characterize the roles of the parties under the contract "[f]or all practical purposes" based upon the fact that ATS initially reviewed the data and screened out those events that did not meet the requirements of the ordinance or the parties' agreement or was otherwise insufficient for the City to demonstrate that a violation had occurred.

One significant difference in the screening process described in <u>Arem</u> and the one in the case before us appears to be that in <u>Arem</u>, screened events may not have been forwarded to the City of Hollywood. Here, the recorded events are placed into working and nonworking queues in accordance with the City's business rules and <u>all</u> of the data is forwarded to the City. However, because the <u>Arem</u> court found that the screening function performed by ATS constituted, "[f]or all practical purposes," a determination of who is subject to prosecution and therefore an unauthorized delegation

- 24 -

of police power, we cannot fully distinguish the holding in <u>Arem</u> based upon the differences between the facts in <u>Arem</u> and those in this case. As the county court noted in this case, the <u>Arem</u> court found that the arrangement by which a city permits ATS to screen data of possible red light violations before the data is reviewed by a TIEO was an unauthorized delegation of the police power. The <u>Arem</u> court reached the same conclusion with regard to the arrangement with a city that allowed ATS to send out a notice of violation and UTC upon the TIEO's acceptance of such a screened event as constituting a violation. Even if the <u>Arem</u> court did not review the City of Hollywood's business rules in reaching its decision, it was aware that ATS's processors screened the data to determine "that certain standards [under the contract] ha[d] been met." 154 So. 3d 365. The <u>Arem</u> court found that this prescreening based on such standards was an unauthorized delegation of police power.

We simply disagree with this conclusion in <u>Arem</u>. We conclude that under the arrangement between the City and ATS, the power to determine whether a red light violation has occurred and the ultimate decision to issue a notice of violation and a UTC remains with the City. Thus, there has been no unauthorized delegation of police power. We explain our reasoning below.

The interpretation of a statute is an issue of law that we review de novo. <u>Id.</u> at 362 (citing <u>Kasischke v. State</u>, 991 So. 2d 803, 807 (Fla. 2008)).

> When construing a statute, we strive to effectuate the Legislature's intent. To determine that intent, we look first to the statute's plain language. "[W]hen the statute is clear and unambiguous, courts will not look behind the statute's plain language for legislative intent or resort to rules of statutory construction to ascertain intent."

Kasischke, 991 So. 2d at 807 (citations omitted) (quoting Borden v. East–European Ins. Co., 921 So. 2d 587, 595 (Fla. 2006)).  The City's power to punish red light violations through the use of red light cameras is limited to the authority granted under chapter 316, including that under the Act.  See Masone v. City of Aventura, 147 So. 3d 492, 495-97 (Fla. 2014).  Certainly, whether the City has the authority to "outsource" that authority must "be derived from the plain wording of the statutes."  Arem, 154 So. 3d at 363-64.  In addition, we have no quarrel with the Arem court's conclusion that "[i]n Florida . . . only law enforcement officers and [TIEOs] are entitled to determine who gets prosecuted for a red light violation."  Id. at 364 (citing §§ 316.0083(3), .640(5)(a)).  However, we part company with the Fourth District when it concludes that "the TIEO[] merely acquiesces in the vendor's decision to issue the citation," and that under the initial review of the computer images of purported violations that the processors exercise "unfettered discretion to decide which images are sent to the TIEO[] and which ones are not."  Id. at 365.

Undoubtedly, section 316.0083(1)(a) permits "a review of information from a traffic infraction detector by an authorized . . . agent of . . . a municipality before issuance of the traffic citation by the [TIEO]."  And, like the Third District in Jimenez, we conclude that the screening function performed by the ATS processors falls within the "review" permitted by the statute.  As noted in Jimenez,

> a government entity can outsource services and use private vendors, provided the essential decisions regarding the exercise of government power are retained by the government or controlled by that body through the promulgation of standards that prevent the private party from having unfettered discretion in the exercise of governmental power.

- 26 -

41 Fla. L. Weekly at D1755-56, see also St. John's Cty. v. Ne. Fla. Builders Ass'n, 583 So. 2d 635, 642 (Fla. 1991) (holding that a county ordinance imposing an impact fee on new residential construction to be used for new school facilities did not constitute an unauthorized delegation of power from the county to the school board because "the fundamental policy decisions [were] made by the county, and the discretion of the school board [was] sufficiently limited"); Citizens v. Wilson, 567 So. 2d 889, 892 (Fla. 1990) (holding that the Florida Public Service Commission did not improperly delegate to its staff "the authority to approve [a] revised supplemental service rider" when "the staff merely carried out the ministerial task of seeing whether [the] conditions [specified by the board] were met").

Although ATS processors initially screen the recorded events on behalf of the City, the screening function is circumscribed by the City's business rules. Naturally, the business rules are designed to avoid wasting the TIEO's time in reviewing events that cannot be prosecuted for one reason or another or that the City has determined it does not wish to review for possible red light violations. Here, as in Jimenez, "under the main guideline, guideline 4.1," ATS processors must "identify images in which the vehicle's front tires are behind . . . the painted stop line." 41 Fla. L. Weekly at D1756. We agree with the Jimenez court that "[w]hether a photograph shows that the front tires have reached a line painted on the pavement is a purely ministerial observation," and usually involves "a simple yes or no" answer. Id. Moreover, to the extent that the City's business rules address when the "front tires are on or slightly over the line of demarcation" in the A-shot, rule 4.2 requires the processor to pass the event for review "as long as there is a video clip which shows the tires were behind the line when the

light turned red."  Thus the City's business rule 4.2 serves to reduce any discretion in applying rule 4.1.  See Jimenez, 41 Fla. L. Weekly at D1756 (noting same). Furthermore, the processors' application of the City's business rules is made under the principle, "[w]hen in doubt, send it out," eliminating any discretion in resolving doubt under the rules.  Accordingly, we find that the review completed by ATS processors is largely ministerial, and thus does not constitute an exercise of unfettered discretion.

Moreover, the placement of data about these events into a working queue does not mean that an ATS processor has made a determination that probable cause for issuance of a UTC exists for those events.  See Jimenez, 41 Fla. L. Weekly at D1759 (Wells, J., specially concurring) (rejecting "the notion advanced by [Arem] that by allowing a servicing agent to forward pre-screened images to a [TIEO] that the servicing agent '[f]or all practical purposes' determines who is subject to prosecution for a red light violation" (alteration in original) (quoting Arem, 154 So. 3d at 365)).  Rather, the TIEOs review these events to determine whether probable cause exists that a red light violation occurred.  In addition, any videos that do not meet the business rule criteria are placed into a nonworking queue that the TIEOs can access and review.  Thus any discretion given to the ATS processors is limited because they are not determining whether an event constitutes a traffic violation, the events are placed into queue based upon the criteria set by the City, and the events in both queues are reviewable by the City.  The ultimate decision to issue a notice of violation and UTC remains with the City.

Furthermore, as the county court noted, the TIEO "do[es] not merely 'acquiesce' to the whims of the ATS processors."  Rather, it is the TIEOs who determine whether a red light violation has occurred, and the evidence reflects that the TIEOs

determine that no probable cause exists for approximately fifty percent of the events placed into the working queue. See Jimenez, 41 Fla. L. Weekly at D1757 (observing that the TIEOs "do not 'merely acquiesce[] in the vendor's decision to issue a citation' . . . . [when] only between sixty-five percent (65%) and seventy percent (70%) are approved as a violation" (first alteration in original) (quoting Arem, 154 So. 3d at 365)). Because the TIEO makes the determination about whether probable cause for a violation exists and whether to issue a notice of violation, no unauthorized delegation of police power has occurred. See State v. State Road Dep't., 173 So. 2d 693, 696 (Fla. 1965) (holding that an act creating a board of highway secondary funds trustees to review applications by counties for the financing of road projects and to make recommendations to the road department did not create an unlawful delegation of power because the board acted only in an advisory capacity); Cty. Collection Servs. Inc. v. Charnock, 789 So. 2d 1109, 1112 (Fla. 4th DCA 2001) (rejecting the argument that the county's contract with a third party for the enforcement of lot clearing and code enforcement liens and the assignment of such liens to a private party constituted an improper delegation of the county's police power because the contract "retain[ed] in the [c]ounty (1) the power to decide which liens to assign; (2) the power to decide what collection techniques are permissible and to prohibit the use of any technique it finds objectionable; (3) the power to take back any assigned debt or lien; and (4) the power to terminate the contract for any or no reason").

As noted by Judge Wells in her specially concurring opinion in Jimenez:

[A]t most the servicing agent has been accorded only the ministerial authority to screen and cull those images which, pursuant to a rigid set of guidelines, clearly show no possible violation of the traffic laws; it is the traffic infraction officer

- 29 -

> alone who determines from the population of possible violators, those who will be subject to prosecution. This . . . is neither a violation of the law nor a matter about which those cited for a violation have authority to complain. Put another way, the real issue here is that some individuals who may have violated traffic regulations may be screened out of the process because the images of their vehicles were not sent to a traffic infraction enforcement officer to determine if a violation has occurred. This argument is no different than that made by an individual issued a speeding ticket who complains that other speeders also were not ticketed. In short, the fact that [ATS] determines certain images will not be forwarded—i.e., that some drivers will not be ticketed— because images taken of their vehicles show that they have not exceeded set guidelines, does not amount to determining whether those drivers who potentially exceed those guidelines have violated the law. That determination, as the record before us confirms, is left solely to [TIEOs].

41 Fla. L. Weekly at D1759.

We also approve the county court's ruling that the acts of printing and mailing the notice of violation and the UTC are merely ministerial acts accomplished by the Axsis software. As noted in Jimenez, if the argument that the preparation of and the mailing of the notices and UTCs through ATS's software constitutes their legal "issuance" within the meaning of the statute, then the individual TIEOs would be required "to affix the stamps, seal the envelopes, and drop the items in the mailbox." Id. at D1757. This is an unreasonable proposition.

ATS cannot accomplish the tasks of preparing and mailing the notices and the UTCs unless a TIEO logs into the ATS system "with his personal log in and badge number, reviews the video, finds probable cause, and authorizes ATS to prepare the notice of violation by clicking 'accept.' " The electronic preparation of the notice and the UTC that follows if the vehicle's registered owner does not reply to the notice do not constitute the power to decide whether those documents should issue. Rather, those

- 30 -

tasks are merely part of the ministerial process of implementing the TIEO's decision to issue them. Accordingly, the completion of the tasks of preparing and mailing the notice and the UTC upon authorization by the TIEO does not constitute the unauthorized delegation of police power. Cf. Gard v. State, 521 So. 2d 369, 370 (Fla. 2d DCA 1988) (rejecting the defendant's argument "that the trial court could not delegate to the prosecutor the task of writing the sentencing order pursuant to findings specifically made by the trial court."); Reid v. State, 673 So. 2d 972, 973 (Fla. 1st DCA 1996) (holding that a trial court fulfilled its duties to pronounce sentence and to specify reasons for departure and did not improperly delegate its authority by directing "the prosecutor to perform the clerical task of preparing a written order consonant with the court's decision").

## VII. CONCLUSION

Based upon the foregoing discussion, we answer the first certified question in the affirmative and the second certified question in the negative. Accordingly, we reverse the order dismissing Ms. Trinh's red light camera citation and remand for further proceedings. We also disagree with the Fourth District's decision in Arem to the extent it conflicts with our decision, and we certify conflict with Arem.

Reversed and remanded; conflict certified.

CASANUEVA and CRENSHAW, JJ., concur.