# Supreme Court of Florida

_____

No. SC16-1976
_____

**LUIS TORRES JIMENEZ,**
Petitioner,

vs.

**STATE OF FLORIDA, etc., et al.,**
Respondents.

[May 3, 2018]

PARIENTE, J.

Luis Torres Jimenez received a traffic citation, based on images from a red light camera that showed him turning right while the traffic signal was red at an intersection marked no-turn-on-red. Jimenez does not dispute that he did, in fact, commit a traffic infraction. Instead, Jimenez challenges the legality of the City of Aventura's red light camera enforcement program, which includes the use of a third-party agent to review images from the City's red light cameras before sending them to City police to determine whether a traffic citation should be issued.

The issue before the Court involves the interpretation of the Mark Wandall Traffic Safety Program, which grants local governments' traffic enforcement officers the power to issue citations for traffic infractions captured by red light cameras. *See* ch. 2010-80, § 5, Laws of Fla.; § 316.0083(1)(a), Fla. Stat. (2014). In addition to this grant of authority, section 316.0083(1)(a) "does not prohibit a *review* of information" from red light cameras by a local government's authorized agent before issuance of the traffic citation by a trained traffic enforcement officer. § 316.0083(1)(a), Fla. Stat. (2014) (emphasis added). In this case, this Court is asked to determine the meaning of the word "review," as used in section 316.0083(1)(a).

The Third District Court of Appeal held that the City did not violate the statute because the City provided its authorized agent with written guidelines to aid its review of the red light camera images, and the decision whether to issue a traffic citation based on the images was made by the City's traffic enforcement officer. *State ex rel. City of Aventura v. Jimenez*, 211 So. 3d 158, 160 (Fla. 3d DCA 2016). The Third District also certified a question of great public importance, which, for purposes of clarity, we rephrase as follows:[1]

---

1. The question that was certified by the Third District asks:

Does the review of red light camera images authorized by section 316.0083(1)(a), Florida Statutes (2014), allow a municipality's vendor, as its agent, to sort images to forward to the law enforcement

Does a local government have the authority under section 316.0083(1)(a), Florida Statutes (2014), to contract with a private third-party vendor to review and sort information from red light cameras, in accordance with written guidelines provided by the local government, before sending that information to a trained traffic enforcement officer who determines whether probable cause exists and a citation should be issued?

*Id.* at 171. We have jurisdiction. *See* art. V, § 3(b)(4), Fla Const.

For the reasons that follow, we answer the rephrased certified question in the affirmative. We therefore approve the Third District's decision.[2]

---

officer, where the controlling contract and City guidelines limit the Vendor to deciding whether the images contain certain easy-to-identify characteristics and where only the law enforcement officer makes the determinations whether probable cause exists and whether to issue a notice of violation and citation?

*Jimenez*, 211 So. 3d at 171.

2. The Third District also ruled upon two other questions, which it certified to be of great public importance:

Is it an illegal delegation of police power for the vendor to print and mail the notices and citation, through a totally automated process without human involvement, after the law enforcement officer makes the determinations that probable cause exists and to issue a notice of violation and citation?

Does the fact that the citation data is electronically transmitted to the Clerk of the Court from the vendor's server via a totally automated process without human involvement violate section 316.650(3)(c), Florida Statutes (2014), when it is the law enforcement officer who affirmatively authorizes the transmission process?

- 3 -

# FACTUAL BACKGROUND

## The City's Red Light Camera Program

The City entered into a contract with American Traffic Solutions, Inc. ("the

Vendor") to service the City's red light camera enforcement program. *Jimenez*,

211 So. 3d at 159. The contract states in pertinent part:

> Vendor shall act as City's agent for the limited purpose of making an initial determination of whether the recorded images should be forwarded to an Authorized Employee to determine whether an infraction has occurred and shall not forward for processing those recorded images that clearly fail to establish the occurrence of an infraction.

*Id.* at 162 (emphasis omitted). The Third District explained the Vendor's

responsibilities under the contract:

> Under the contract and its various amendments, the Vendor sorts the information and images generated by the system into two databases: a "working" database that the City police review to decide whether to issue a citation and a "non-working" database that the City police do not review for that purpose. Each image placed in the non-working database is reported, and the reason for placing the image in the non-working database is explained by the Vendor on a report screen. The report screen is periodically reviewed by the sergeant in charge of the City's review. The non-working database remains available and is occasionally accessed by the police for other investigations.
> Each month, approximately 5,000 images are sorted into the working database and 3,000 are sorted into the non-working database. The police sergeant who oversees the City's review testified that the

---

*Id.* at 171-72. We decline to address these questions and approve in full the Third District's analysis of these issues.

City would be overwhelmed if it was required to review all images generated by the system.

To sort images, the Vendor conducts a review that includes (1) confirming workable images exist (and the camera did not simply misfire); (2) examining the images to verify the license plate of the subject vehicle is legible; (3) using the license plate number in an automated process to obtain the identifying information of the registered owner from the Florida Department of Motor Vehicles; (4) confirming the capture of date, time-of-day, speed, and timing-of-light data; (5) checking the "A" shot, which is a still photograph showing the vehicle approaching the intersection; (6) checking the "B" shot, which shows the vehicle in the intersection; and (7) checking the twelve-second video clip that shows the vehicle approaching and traveling through the intersection. The Vendor can pause the video and view it frame by frame.

A representative of the Vendor testified that the Vendor's task when reviewing images was to filter out images that were "useless." A clear example, she explained, is where a camera simply misfired and failed to record an image. Other examples are where the light displays green or where images fail to capture a vehicle's license plate number. These images were useless, she testified, because "the police cannot do anything with them." But other images are determined to be useless based on the specific and detailed contract language and City guidelines.

*Id.* at 161.

To aid the Vendor in the sorting process, the City provided the Vendor with a set of guidelines, known as the "Business Rules Questionnaire." *Id.* at 162. The Third District explained:

The guidelines govern the Vendor's task of checking the "A" and "B" shots and the video clip. The guidelines were created by a process in which the Vendor identified scenarios or decision points and suggested alternative solutions to the City. For the most part, the City selected one of the alternative solutions suggested by the Vendor, but in several instances, the City created its own solutions.

For example, guideline 4.1 concerns the line of demarcation, which means the boundary of the intersection. This is the line used to evaluate the "A" shot, which is the photograph that shows the vehicle approaching the intersection. In reviewing this guideline, one must keep in mind that if the front tires of a vehicle crossed the boundary and entered the intersection when the light is still displaying green, the vehicle obviously is not running a red light. Conversely, if the front tires had not yet reached this line when the light displays red, the vehicle would appear to be running a red light (assuming the vehicle does not immediately stop within the edge of the intersection and wait for a green light). All of the City intersections containing red light cameras have painted stop lines. The Vendor provided four alternative suggestions for the line of demarcation: (1) the stop line; (2) the prolongation of the curb; (3) the crosswalk; and (4) whichever line the tires will hit first. The City adopted the first suggestion: the line of demarcation is the painted stop line. A similar process was followed for the other guidelines.

*Id.* at 162-63.

As to the role of traffic enforcement officers in the City's red light camera program, the Third District explained:

The police officers assigned to red light camera enforcement access the working database by logging into the server using their own unique user identification and password. The officers decide to issue a citation based on the images in the same manner they decide to issue a roadside citation. If, after reviewing the photographs, video, and other information, the officer decides to issue a citation, the officer clicks the "accept" button on the screen. By doing so, the officer authorizes his or her electronic signature and badge number to appear on the notice and citation. The officer's review and determination in this regard is far from a mere rubber stamp. As the trial court expressly found, "[o]f the images reviewed by the City's police officers, only between sixty-five percent (65%) and seventy percent (70%) are approved as a violation."

- 6 -

*Id.* at 163 (alteration in original); *see* § 316.640(1)(b)3., Fla. Stat. (2014) (empowering local police departments to "designate employees as traffic infraction enforcement officers").

**Jimenez's Citation**

Jimenez received a traffic citation charging him with "running a red light by turning right at an intersection marked no-turn-on-red." *Jimenez*, 211 So. 3d at 159. Probable cause for the citation was based on photographs and video from the City's red light camera program. *Id.* Officer Jeanette Castro, "a thirteen-year veteran of the City Police Department who has issued thousands of traffic citations roadside, and hundreds as part of the red light camera program," issued Jimenez's citation. *Id.* at 163. She testified that her decision to issue Jimenez's citation "was based on the same factors and criteria she uses when she issues a citation for a similar roadside violation." *Id.* at 164.

Jimenez moved to dismiss his citation in county court, arguing that the City's red light camera program is illegal because it gives the Vendor unfettered discretion (1) "that exceeded the City's statutory authority to use an agent" to review images from red light cameras; (2) "in printing and mailing notices and citations in violation" of Florida Statutes; and (3) in sending an electronic copy of the citation to the Clerk of Courts in violation of Florida Statutes. *Id.* at 159-60.

Following an evidentiary hearing, the county court dismissed Jimenez's citation. *Id.* at 159, 164. While the county court agreed with the City that there was no violation in the Vendor printing and mailing notices and citations or sending an electronic copy of the citation to the Clerk of Court, it concluded that it was "bound by" *City of Hollywood v. Arem*, 154 So. 3d 359 (Fla. 4th DCA 2012), in which the Fourth District Court of Appeal affirmed the trial court's dismissal of a traffic citation, holding that the City of Hollywood's red light camera enforcement program amounted to an unlawful delegation of the City's police power under section 316.0083(1)(a). *Id.* at 361. Although the county court dismissed Jimenez's citation, in a very well-reasoned and detailed order, it certified the same three questions to the Third District that the Third District has now certified to this Court regarding the City's authority to contract with a third party to review images captured by red light cameras.[3]

**The Third District's Decision**

Jimenez argued in the Third District that the City's guidelines gave the Vendor "unfettered discretion to place items into the non-working database where

---

3. Florida Rule of Appellate Procedure 9.030(b)(4) recognizes that district courts of appeal have discretionary jurisdiction to review "final orders of the county court . . . that the county court has certified to be of great public importance."

The questions certified by the county court vary slightly in wording but are substantively the same as those certified by the Third District to this Court. *See Jimenez*, 211 So. 3d at 164, 171-72.

- 8 -

they are never reviewed by the police for purposes of issuing citations." *Jimenez*, 211 So. 3d at 165. The Third District rejected that argument, explaining that "the type of evaluation exercised in the Vendor's decisions is clerical and ministerial." *Id.* at 166. Additionally, the Third District noted that the Vendor was instructed that "if there is any doubt" as to whether an image should be placed in the working queue, it should "send [the image] to the police for review." *Id.* Similarly, if an image presented a situation that was not addressed in the guidelines, the Vendor was instructed to "always put [it] in the working database for police review." *Id.* at 168. Lastly, the City does not issue any citation "unless and until an individual officer of the City weighs the evidence in the images and determines in his or her professional judgment that probable cause exists," and "[t]he officers make these decisions in the same manner they decide to issue a roadside citation." *Id.* The Third District thus concluded that there was no unconstitutional delegation of authority and reversed the dismissal of the citation.

## ANALYSIS

The issue before the Court involves the meaning of the word "review" as used in section 316.0083(1)(a), Florida Statutes (2014). Because resolving this question requires us to construe the relevant statutory provisions, our review is de novo. *See Borden v. East-European Ins. Co.*, 921 So. 2d 587, 591 (Fla. 2006).

Our analysis begins with chapter 316, Florida Statutes, which codifies the "Florida Uniform Traffic Control Law." § 316.001, Fla. Stat. (2014). We then turn to the Mark Wandall Traffic Safety Act, which authorizes traffic enforcement officers to issue traffic citations based on images from red light cameras. Ch. 2010-80, § 5, Laws of Fla.; § 316.0083(1)(a), Fla. Stat. (2014). After setting forth the relevant statutory provisions, we discuss two additional district court decisions that have addressed the legality of red light camera enforcement programs. Finally, with the legal background set, we answer the rephrased certified question in this case.

## I. The Florida Uniform Traffic Control Law

Chapter 316, Florida Statutes, codifies the "Florida Uniform Traffic Control Law." § 316.001, Fla. Stat. (2014). The Legislature's intent in creating the chapter was "to make uniform traffic laws to apply throughout the state and its several counties and uniform traffic ordinances to apply in all municipalities." *Id.* § 316.002. Section 316.002 makes it unlawful "for any local authority to pass or to attempt to enforce any ordinance in conflict with the provisions of" chapter 316. *Id.* Striking a similar tone, section 316.007 states that the provisions of chapter 316 "shall be applicable and uniform throughout this state and in all political subdivisions and municipalities therein, and no local authority shall enact or enforce any ordinance on a matter covered by this chapter unless expressly

- 10 -

authorized." *Id.* § 316.007. This Court has stated that "[c]hapter 316 could not be clearer in providing that local ordinances on 'a matter covered by' the chapter are preempted unless an ordinance is 'expressly authorized' by the statute." *Masone v. City of Aventura*, 147 So. 3d 492, 496-97 (Fla. 2014) (quoting § 316.007, Fla. Stat. (2008)).

### The Mark Wandall Traffic Safety Act

In 2010, the Legislature enacted the Mark Wandall Traffic Safety Act ("the Wandall Act"), which authorizes local governments "to use traffic infraction detectors under certain circumstances." Ch. 2010-80, Laws of Fla.; *see id.* § 13. A "traffic infraction detector" is defined as:

> A vehicle sensor installed to work in conjunction with a traffic control signal and a camera or cameras synchronized to automatically record two or more sequenced photographic or electronic images or streaming video of only the rear of a motor vehicle at the time the vehicle fails to stop behind the stop bar or clearly marked stop line when facing a traffic control signal steady red light.

§ 316.003(87), Fla. Stat. (2014). In layman's terms, a traffic infraction detector is a red light camera. *See id*.

Section 316.0076, Florida Statutes (2014), expressly preempts the "[r]egulation of the use of cameras for enforcing the provisions of" chapter 316 "to the state." Express preemption notwithstanding, section 316.008, Florida Statutes (2014), states that "[t]he provisions of this chapter shall not be deemed to prevent local authorities, with respect to streets and highways under their jurisdiction and

within the reasonable exercise of the police power" from using red light cameras. *Id.* § 316.008(1); *accord id.* (8).

Section 316.0083(1)(a) expressly authorizes a traffic infraction enforcement officer to issue a traffic citation for a violation of certain red light traffic infractions. *Id.* § 316.0083(1)(a). Section 316.0083(1)(a) also states:

> This paragraph *does not prohibit a review of information* from a traffic infraction detector *by an authorized employee or agent* of the department, a county, or a municipality before issuance of the traffic citation by the traffic infraction enforcement officer.

*Id.* (emphasis added).

Having set forth the relevant statutory provisions, we now turn to address two other district court decisions that examined the legality of red light camera enforcement programs.

## II. Related District Court of Appeal Decisions

In dismissing Jimenez's citation, the county court relied on *City of Hollywood v. Arem*, in which the Fourth District held that the City of Hollywood was "not authorized to delegate police power by entering into a contract that allows a private vendor to screen data and decide whether a violation has occurred before sending that data to a traffic infraction enforcement officer . . . to use as the basis for authorizing a citation." 154 So. 3d at 361. The Fourth District further concluded in *Arem* that the City of Hollywood "lack[ed] the lawful authority to outsource to a third-party vendor the ability to make the initial review of the

- 12 -

computer images of purported violations and then use its unfettered discretion to decide which images are sent to the [traffic enforcement officer], and which ones are not." *Id.* at 365.

Addressing the same issue in *City of Oldsmar v. Trinh*, 210 So. 3d 191 (Fla. 2d DCA 2016), the Second District Court of Appeal agreed with the Third District in *Jimenez* that, because the traffic enforcement officer "makes the determination about whether probable cause for a violation exists and whether to issue a notice of violation, no unauthorized delegation of police power has occurred." *Id.* at 207. The Second District certified conflict with *Arem*, explaining that it "simply disagree[d] with th[e] conclusion in *Arem*" that a review of images by the City's authorized agent in accordance with certain guidelines provided by the City was not an authorized delegation of police power. *Id.* at 205.[4]

We now turn to the rephrased certified question presented in this case.

### III. The Rephrased Certified Question

Jimenez argued to the county court and the Third District that the City's red light camera enforcement program amounted to an unlawful delegation of police

---

4. This Court initially accepted jurisdiction in *Trinh* based on certified conflict with the Fourth District's decision in *Arem*. However, upon the City of Oldmar's suggestion of mootness, this Court dismissed the case after Trinh was acquitted of her red light camera citation on grounds unrelated to the legality of red light cameras.

powers by giving the Vendor "unfettered discretion that exceeded the City's statutory authority to use an agent to 'review' images" under section 316.0083(1)(a). *Jimenez*, 211 So. 3d at 159-60. In this Court, Jimenez does not pursue his unlawful delegation argument and argues instead that the City's red light camera enforcement program (A) unlawfully exceeds the authority conferred upon the City by the Legislature because "review" under section 316.0083(1)(a) is limited to determining whether images from red light cameras are "complete and usable"; and (B) is unconstitutional because it violates the uniformity principle set forth in chapter 316. We address each argument in turn.

**A. Whether the City Exceeded its Statutory Authority in Contracting with the Vendor to Review the Red Light Camera Images**

Jimenez argues that the City's red light camera program exceeds the authority granted by the Legislature with respect to the meaning of the word "review" as used in section 316.0083(1)(a). Specifically, Jimenez asserts that the word "review" as used in section 316.0083(1)(a) is limited to ensuring that the images from the red light camera are complete and usable, as opposed to the review conducted by the Vendor in this case, which, according to Jimenez, involves making a preliminary determination as to whether a traffic infraction has occurred. While Jimenez argues in favor of a narrow construction of the word "review," the City and the State maintain that the delegation of authority authorized by the Legislature in using the term "review" is broader and includes an

evaluation of not only whether the images are complete and usable, but whether they meet certain guidelines, as provided by the City.

"In matters of statutory construction, we have repeatedly recognized that legislative intent is the polestar that guides the Court." *Sch. Bd. of Palm Beach Cty. v. Survivors Charter Schs., Inc.*, 3 So. 3d 1220, 1232 (Fla. 2009). "The plain meaning of the statute is always the starting point in statutory interpretation." *GTC, Inc. v. Edgar*, 967 So. 2d 781, 785 (Fla. 2007). "[I]f the meaning of the statute is clear then this Court's task goes no further than applying the plain language of the statute." *Id.* "However, if the language is unclear or ambiguous, then the Court applies rules of statutory construction to discern legislative intent." *Polite v. State*, 973 So. 2d 1107, 1111 (Fla. 2007). "In addition, examining the history of the legislation is a helpful tool in determining legislative intent." *Raymond James Fin. Servs., Inc. v. Phillips*, 126 So. 3d 186, 192 (Fla. 2013).

The Legislature did not define, or otherwise elaborate upon, the word "review" in section 316.0083(1)(a). Although at times we turn to dictionary definitions to ascertain the plain meaning of a statutory term, *see License Acquisitions, LLC v. Debary Real Estate Holdings, LLC*, 155 So. 3d 1137, 1144 (Fla. 2014), because "review" can mean something as broad as examining critically, or as narrow as viewing, the plain meaning of the word is not clear. *See Merriam-Webster's Collegiate Dictionary* 1067 (11th ed. 2005) (providing many

- 15 -

definitions of "review," including "to view or see again," "to examine or study again," or "to go over or examine critically or deliberately").  Accordingly, "this Court should look to the [other] rules of statutory construction to help interpret legislative intent, which may include the examination of a statute's legislative history and the purpose behind its enactment."  *Edwards v. Thomas*, 229 So. 3d 277, 283 (Fla. 2017) (quoting *W. Fla. Reg'l Med. Ctr. v. See*, 79 So. 3d 1, 9 (Fla. 2012)).

Courts "cannot read a statutory subsection in isolation, 'but must read it within the context of the entire section in order to ascertain legislative intent for the provision.' "  *Larimore v. State*, 2 So. 3d 101, 114 (Fla. 2008) (quoting *Fla. Dep't of Envtl. Protection v. ContractPoint Fla. Parks*, *LLC*, 986 So. 2d 1260, 1265 (Fla. 2008)).  Section 316.0083(1)(a), in its entirety, provides:

> For purposes of administering this section, the department, a county, or a municipality may authorize a traffic infraction enforcement officer under s. 316.640 to issue a traffic citation for a violation of s. 316.074(1) or s. 316.075(1)(c)1.  A notice of violation and a traffic citation may not be issued for failure to stop at a red light if the driver is making a right-hand turn in a careful and prudent manner at an intersection where right-hand turns are permissible.  A notice of violation and a traffic citation may not be issued under this section if the driver of the vehicle came to a complete stop after crossing the stop line and before turning right if permissible at a red light, but failed to stop before crossing over the stop line or other point at which a stop is required.  This paragraph does not prohibit a review of information from a traffic infraction detector by an authorized employee or agent of the department, a county, or a municipality before issuance of the traffic citation by the traffic infraction enforcement officer.  This paragraph does not prohibit the

- 16 -

department, a county, or a municipality from issuing notification as provided in paragraph (b) to the registered owner of the motor vehicle involved in the violation of s. 316.074(1) or s. 316.075(1)(c)1.

§ 316.0083(1)(a), Fla. Stat. (2014).  Under the statute, the review contemplated is "of information from a traffic infraction detector," *id.*, which, as section 316.003(87) makes clear, consists of "photographic or electronic images or streaming video."  *Id.* § 316.003(87).

Reading the provision in its entirety, we conclude that section 316.0083(1)(a) allows a local government's authorized agent to review images from red light cameras for any purpose short of making the probable cause determination to issue a traffic citation.  By including two specific examples of what is not a traffic infraction immediately before stating that an authorized agent can review the information captured by red light cameras, which includes photographs and video, it is clear the Legislature contemplated that the agent would conduct an initial review of those photographs or video or both, before a traffic enforcement officer determines whether probable cause exists to issue a traffic citation.  There is simply no indication that the Legislature intended the narrow definition of the word "review" advanced by Jimenez.

Jimenez makes two separate statutory arguments in support of his interpretation of the word "review," both of which we reject.  First, Jimenez refers to an earlier version of the bill proposed during the bill drafting process in which a

- 17 -

traffic citation could have been issued based on "a signed statement by a specifically trained technician employed by the agency or its contractor that, based on inspection of photographs or other recorded images," the driver of the vehicle committed a traffic infraction. Fla. HB No. 325, § 3 (filed Nov. 6, 2009) (proposed § 316.0083(1)(d)). Even if we were to consider an earlier version of the bill proposed during the bill drafting process, we conclude that it would not help Jimenez because the enacted version retained the use of authorized agents but did not allow those agents to determine whether a citation should be issued. In other words, although the Legislature authorized local governments to delegate initial review responsibilities to an agent, the Legislature clearly intended that the ultimate authority to issue a citation would remain with a trained traffic enforcement officer. Thus, this argument does not support Jimenez's narrow interpretation of the word "review" in section 316.0083(1)(a).

Second, Jimenez notes that a single sentence in a legislative staff analysis of the Wandall Act references the existing statutory scheme for the enforcement of toll violations, which includes the use of cameras. *See* Fla. H.R. Policy Comm. on Roads, Bridges & Ports, HB 325 (2010) Staff Analysis 3 (Jan. 8, 2010) ("Cameras are permitted by current Florida law to enforce violations of payment of tolls.") (citing § 316.1001(2)(d), Fla. Stat. (2009)). The toll violation statutory scheme authorized "a toll enforcement officer to issue" citations for toll violations and

allowed toll operators to employ "independent contractors or designate employees as toll enforcement officers." § 316.1001(2)(a), Fla. Stat. (2009); *id.* § 316.640(1)(b)2.b. From that brief reference, Jimenez continues on his journey of statutory construction by pointing to a Florida Administrative Code rule that limited the toll enforcement officers or their designees to "review[ing] captured photographic images . . . to ensure accuracy and data integrity." Fla. Admin Code R. 14-100.002(3). Jimenez asserts that this administrative rule's definition of the word "review," which is limited to ensuring accuracy, supports his interpretation of the word "review" in section 316.0083(1)(a). We disagree.

The reference to the toll violation statute in the staff analysis for the Wandall Act was one line in a comprehensive eleven-page analysis, which simply states that cameras are currently used to enforce tollbooth violations; the toll violation statutory scheme was not otherwise mentioned in the staff analysis. Further, the word "review" does not appear in the toll enforcement statute. Lastly, the administrative rule Jimenez cites does not even pertain to the statute at issue in this case. We thus conclude that this argument does not support Jimenez's narrow interpretation of the word "review" in section 316.0083(1)(a).

Ultimately, Jimenez cannot escape the fact that the term "review," as used in section 316.0083(1)(a), indicates some evaluative component, and there is no indication that the Legislature intended the most restrictive version of the term in

the context of this statute. We therefore hold that section 316.0083(1)(a) authorizes a local government to contract with a private third-party vendor to review and sort information from red light cameras, in accordance with written guidelines provided by the local government, before sending that information to a trained traffic enforcement officer who determines whether probable cause exists and a citation should be issued.

In this case, the City provided the Vendor with written guidelines to use when reviewing and sorting the images before sending to a trained traffic enforcement officer who determines whether probable cause exists and a citation should be issued. Thus, the City's red light camera enforcement program does not exceed the authority granted in section 316.0083(1)(a). We now turn to address Jimenez's argument regarding uniformity.[5]

## B. Uniformity

Jimenez also argues that the City's adoption and use of its own set of standards, or guidelines, for determining whether a traffic infraction has occurred violates the uniformity principle set forth in chapter 316. *See* § 316.002, .007, Fla. Stat. (2014). Essentially, Jimenez complains that the City's red light camera

---

5. Jimenez also argues that the City's red light camera enforcement program is invalid because it is preempted by state law. We need not address this argument because it is dependent upon our agreement with Jimenez regarding the meaning of "review" in section 316.0083(1)(a).

enforcement program may be underinclusive because there is a possibility that other motorists may have committed a red light camera violation but did not receive a citation because, based on the City's guidelines, the images were sorted into the non-working queue.

The City explained that it often makes decisions regarding the enforcement of traffic infractions, including where to place red light cameras, as they are not placed at every intersection. Likewise, even without the use of red light cameras, traffic enforcement officers cannot be present at every intersection. As a result, there will inevitably be traffic infractions that go undetected and uncited.

Importantly, Jimenez makes no suggestion of discriminatory enforcement. Rather, he seems to assert that it would be fairer if the Vendor sent all usable images to the City for review. We disagree. This is no different than a traffic enforcement officer on the road stopping and citing one individual for exceeding the speed limit, while not citing others doing the same. Indeed, as Judge Wells cogently stated in her special concurrence in *Jimenez*:

> The record in this case establishes that at most the servicing agent has been accorded only the ministerial authority to screen and cull those images which, pursuant to a rigid set of guidelines, clearly show no possible violation of the traffic laws; it is the traffic infraction officer alone who determines from the population of possible violators, those who will be subject to prosecution. This, in my opinion, is neither a violation of the law nor a matter about which those cited for a violation have authority to complain. Put another way, the real issue here is that some individuals who may have violated traffic regulations may be screened out of the process because

the images of their vehicles were not sent to a traffic infraction enforcement officer to determine if a violation has occurred. This argument is no different than that made by an individual issued a speeding ticket who complains that other speeders also were not ticketed. In short, the fact that [the Vendor] determines certain images will not be forwarded—i.e., that some drivers will not be ticketed—because images taken of their vehicles show that they have not exceeded set guidelines, does not amount to determining whether those drivers who potentially exceed those guidelines have violated the law. That determination, as the record before us confirms, is left solely to traffic infraction enforcement officers.

211 So. 3d at 173-74 (Wells J., specially concurring).

Based on the foregoing, we conclude that Jimenez's arguments that the City's red light camera enforcement program (A) unlawfully exceeds the grant of authority in section 316.0083(1)(a), and (B) violates the uniformity principle set forth in chapter 316, are without merit.

## CONCLUSION

The Legislature has expressly authorized local governments to allow traffic enforcement officers to issue citations for traffic infractions captured by red light cameras. As part of this express authorization, the Legislature has permitted a local government's agent to review information from red light cameras for any purpose short of making the probable cause determination as to whether a traffic infraction was committed. We thus hold that section 316.0083(1)(a) authorizes a local government to contract with a private third-party vendor to review and sort information from red light cameras, in accordance with written guidelines provided

- 22 -

by the local government, before sending that information to a trained traffic enforcement officer, who determines whether probable cause exists and a citation should be issued.

Accordingly, we answer the rephrased certified question in the affirmative and approve the decision of the Third District in *Jimenez*. We also approve the decision of the Second District in *Trinh* and disapprove the decision of the Fourth District in *Arem* to the extent it is inconsistent with this opinion.

It is so ordered.

LABARGA, C.J., and QUINCE, J., concur.
LEWIS, J., concurs in result.
CANADY, J., concurs specially with an opinion, in which POLSTON and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, J., specially concurring.

I agree that the Third District's decision in *State ex rel. City of Aventura v. Jimenez*, 211 So. 3d 158 (Fla. 3d DCA 2016), and the Second District's decision in *City of Oldsmar v. Trinh*, 210 So. 3d 191 (Fla. 2d DCA 2016), should be approved, and that the Fourth District's decision in *City of Hollywood v. Arem*, 154 So. 3d 359 (Fla. 4th DCA 2014), should be disapproved. I join in the majority's rejection of Jimenez's argument that is based on the uniformity requirement of section 316.007, Florida Statutes (2014).

- 23 -

I also agree that Jimenez's argument regarding the meaning of "review" in section 316.0083(1)(a), Florida Statutes (2014), is unavailing. Nothing in the text or context suggests that a narrow reading should be imposed on "review." The statute in no way precludes a local government from contracting with a third-party vendor to provide assistance in screening images from red light cameras in any way the local government sees fit other than authorizing the vendor to issue citations. On this point, the critical issue is not the details of the relationship between the local government and the vendor. Rather, the dispositive point is that the local government conforms to the requirement that only law enforcement officers and traffic infraction enforcement officers—rather than employees of a vendor—may issue traffic citations.

POLSTON and LAWSON, JJ., concur.

Application for Review of the Decision of the District Court of Appeal – Certified Great Public Importance

  Third District - Case Nos. 3D15-2271 and 3D15-2303

  (Dade County)

Marc A. Wites of Wites & Kapetan, P.A., Lighthouse Point, Florida; Stephen F. Rosenthal and Ramon A. Rasco of Podhurst Orseck, P.A., Miami, Florida; and Louis C. Arslanian of Gold & Associates, P.A., Hollywood, Florida,

  for Petitioner

Edward G. Guedes and Samuel I. Zeskind of Weiss Serota Helfman Cole & Bierman, P.L., Coral Gables, Florida; and Pamela Jo Bondi, Attorney General, Amit Agarwal, Solicitor General, Rachel Nordby, Deputy Solicitor General,

Tallahassee, Florida, and Robert Dietz, Senior Assistant Attorney General, Tampa, Florida,

for Respondent

E. Bruce Johnson and Christopher J. Stearns of Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A., Fort Lauderdale, Florida; and Kraig A. Conn and David Cruz of Florida League of Cities, Inc., Tallahassee, Florida,

Amici Curiae Florida League of Cities, Inc., Village of Bal Harbor, City of Cocoa Beach, Town of Cutler Bay, City of Doral, Village of Key Biscayne, City of Miami Gardens, Village of Palm Springs, City of Sunrise, City of West Park, Town of Campbellton, City of Clermont, City of Coral Springs, Village of El Portal, City of Green Cove Springs, City of Hialeah Gardens, City of Holly Hill, Town of Juno Beach, City of Lauderdale Lakes, City of Miami Springs, City of Milton, North Bay Village, City of Oldsmar, City of Opa-locka, Town of Orange Park, City of Palatka, City of Palm Coast, City of Surfside, City of Sweetwater, City of Tamarac, City of West Miami, and City of Pembroke Pines ("Local Governments")